# GITLOW v. PEOPLE OF NEW YORK.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 19. Argued April 12, 1923; reargued November 23, 1923.— Decided June 8, 1925.

1. *Assumed,* for the purposes of the case, that freedom of speech and of the press are among the personal rights and liberties protected by the due process clause of the Fourteenth Amendment from impairment by the States. P. 666.
2. Freedom of speech and of the press, as secured by the Constitution, is not an absolute right to speak or publish without responsibility whatever one may choose or an immunity for every possible use of language. P. 666.
3. That a State, in the exercise of its police power, may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime or disturb the public peace, is not open to question. P. 667.
4. For yet more imperative reasons, a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means. P. 667.
5. A statute punishing utterances advocating the overthrow of organized government by force, violence and unlawful means, imports a legislative determination that such utterances are so inimical to the general welfare and involve such danger of substantive evil that they may be penalized under the police power; and this determination must be given great weight, and every presumption be indulged in favor of the validity of the statute. P. 668.
6. Such utterances present sufficient danger to the public peace and security of the State to bring their punishment clearly within the range of legislative discretion, even if the effect of a given utterance can not accurately be foreseen. P. 669.
7. A State can not reasonably be required to defer taking measures against these revolutionary utterances until they lead to actual disturbances of the peace or imminent danger of the State's destruction. P. 669.
8. The New York statute punishing those who advocate, advise or teach the duty, necessity or propriety of overthrowing or overturning organized government by force, violence, or any unlawful means, or who print, publish, or knowingly circulate any book,

paper, etc., advocating, advising or teaching the doctrine that organized government should be so overthrown, does not penalize the utterance or publication of abstract doctrine or academic discussion having no quality of incitement to any concrete action, but denounces the advocacy of action for accomplishing the overthrow of organized government by unlawful means, and is constitutional as applied to a printed "Manifesto" advocating and urging mass action which shall progressively foment industrial disturbances and, through political mass strikes and revolutionary mass action overthrow and destroy organized parliamentary government; even though the advocacy was in general terms and not addressed to particular immediate acts or to particular persons. Pp. 654, 672.

9. The statute being constitutional, it may constitutionally be applied to every utterance—not too trivial to be beneath the notice of the law—which is of such a character and used with such intent and purpose as to bring it within the prohibition of the statute; and the question whether the specific utterance in question was likely to bring about the substantive evil aimed at by the statute, is not open to consideration. *Schenck* v. *United States,* 249 U. S. 47, explained. P. 670.

195 App. Div. 773; 234 N. Y., 132, 539, affirmed.

ERROR to a judgment of the Supreme Court of New York, affirmed by the Appellate Division thereof and by the Court of Appeals, sentencing the plaintiff in error for the crime of criminal anarchy, (New York Laws, 1909, c. 88), of which he had been convicted by a jury.

*Messrs. Walter Nelles* and *Walter H. Pollak,* with whom *Messrs. Albert De Silver* and *Charles S. Ascher* were on the brief, for plaintiff in error.

*Messrs W. J. Weatherbee,* Deputy Attorney General of New York, and *John Caldwell Myers,* Assistant District Attorney of New York County, with whom *Messrs. Carl Sherman,* Attorney General of New York, *Claude T. Dawes,* Deputy Attorney General of New York, *Joab H. Banton,* District Attorney of New York County, and *John F. O'Neil,* Assistant District Attorney of New York County, were on the briefs, for defendant in error.

MR. JUSTICE SANFORD delivered the opinion of the Court.

Benjamin Gitlow was indicted in the Supreme Court of New York, with three others, for the statutory crime of criminal anarchy. New York Penal Laws, §§ 160, 161.[1] He was separately tried, convicted, and sentenced to imprisonment. The judgment was affirmed by the Appellate Division and by the Court of Appeals. 195 App. Div. 773; 234 N. Y. 132 and 539. The case is here on writ of error to the Supreme Court, to which the record was remitted. 260 U. S. 703.

The contention here is that the statute, by its terms and as applied in this case, is repugnant to the due process clause of the Fourteenth Amendment. Its material provisions are:

" § 160. *Criminal anarchy defined.* Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means. The advocacy of such doctrine either by word of mouth or writing is a felony.

" § 161. *Advocacy of criminal anarchy.* Any person who:

" 1. By word of mouth or writing advocates, advises or teaches the duty, necessity or propriety of overthrowing or overturning organized government by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means; or,

" 2. Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any

---

[1] Laws of 1909, ch. 88; Consol. Laws, 1909, ch. 40. This statute was originally enacted in 1902. Laws of 1902, ch. 371.

form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means  . . :  .  ,  .

"Is guilty of a felony and punishable" by imprisonment or fine, or both.

The indictment was in two counts. The first charged that the defendant had advocated, advised and taught the duty, necessity and propriety of overthrowing and overturning organized government by force, violence and unlawful means, by certain writings therein set forth entitled "The Left Wing Manifesto"; the second that he had printed, published and knowingly circulated and distributed a certain paper called "The Revolutionary Age," containing the writings set forth in the first count advocating, advising and teaching the doctrine that organized government should be overthrown by force, violence and unlawful means.

The following facts were established on the trial by undisputed evidence and admissions: The defendant is a member of the Left Wing Section of the Socialist Party, a dissenting branch or faction of that party formed in opposition to its dominant policy of "moderate Socialism." Membership in both is open to aliens as well as citizens. The Left Wing Section was organized nationally at a conference in New York City in June, 1919, attended by ninety delegates from twenty different States. The conference elected a National Council, of which the defendant was a member, and left to it the adoption of a "Manifesto." This was published in The Revolutionary Age, the official organ of the Left Wing. The defendant was on the board of managers of the paper and was its business manager. He arranged for the printing of the paper and took to the printer the manuscript of the first issue which contained the Left Wing Manifesto, and also a Communist Program and a Program of the Left Wing that had been adopted by the conference. Sixteen thousand

copies were printed, which were delivered at the premises in New York City used as the office of the Revolutionary Age and the headquarters of the Left Wing, and occupied by the defendant and other officials. These copies were paid for by the defendant, as business manager of the paper. Employees at this office wrapped and mailed out copies of the paper under the defendant's direction; and copies were sold from this office. It was admitted that the defendant signed a card subscribing to the Manifesto and Program of the Left Wing, which all applicants were required to sign before being admitted to membership; that he went to different parts of the State to speak to branches of the Socialist Party about the principles of the Left Wing and advocated their adoption; and that he was responsible for the Manifesto as it appeared, that "he knew of the publication, in a general way and he knew of its publication afterwards, and is responsible for its circulation."

There was no evidence of any effect resulting from the publication and circulation of the Manifesto.

No witnesses were offered in behalf of the defendant.

Extracts from the Manifesto are set forth in the margin.[2] Coupled with a review of the rise of Socialism, it

---

[2] Italics are given as in the original, but the paragraphing is omitted.

**" The Left Wing Manifesto "**
" Issued on Authority of the Conference by the National Council of the Left Wing.

" The world is in crisis. Capitalism, the prevailing system of society, is in process of disintegration and collapse. . . . Humanity can be saved from its last excesses only by the Communist Revolution. There can now be only the Socialism which is one in temper and purpose with the proletarian revolutionary struggle. . . . The class struggle is the heart of Socialism. Without strict conformity to the class struggle, in its revolutionary implications, Socialism becomes either sheer Utopianism, or a method of reaction. . . . The dominant Socialism united with the capitalist

condemned the dominant "moderate Socialism" for its
recognition of the necessity of the democratic parliamen-
tary state; repudiated its policy of introducing Socialism
by legislative measures; and advocated, in plain and un-
equivocal language, the necessity of accomplishing the
"Communist Revolution" by a militant and "revolu-
tionary Socialism", based on "the class struggle" and mo-

governments to prevent a revolution. The Russian Revolution was
the first act of the proletariat against the war and Imperialism. . . .
[The] proletariat, urging on the poorer peasantry, conquered power.
It accomplished a proletarian revolution by means of the Bolshevik
policy of 'all power to the Soviets,'—organizing the new transitional
state of proletarian dictatorship. . . . Moderate Socialism affirms
that the bourgeois, democratic parliamentary state is the necessary
basis for the introduction of Socialism. . . . Revolutionary
Socialism, on the contrary, insists that the democratic parliamentary
state can never be the basis for the introduction of Socialism; that
it is necessary to destroy the parliamentary state, and construct a
new state of the organized producers, which will deprive the bour-
geoisie of political power, and function as a revolutionary dictatorship
of the proletariat. . . . Revolutionary Socialism alone is capable
of mobilizing the proletariat for Socialism, for the conquest of the
power of the state, by means of revolutionary mass action and
proletarian dictatorship. . . . Imperialism is dominant in the
United States, which is now a world power. . . . The war has
aggrandized American Capitalism, instead of weakening it as in
Europe. . . . These conditions modify our immediate task, but
do not alter its general character; this is not the moment of revolu-
tion, but it is the moment of revolutionary struggle. . . . . Strikes
are developing which verge on revolutionary action, and in which the
suggestion of proletarian dictatorship is apparent, the striker-work-
ers trying to usurp functions of municipal government, as in Seattle
and Winnipeg. The mass struggle of the proletariat is coming into
being. . . . . These strikes will constitute the determining feature
of proletarian action in the days to come. Revolutionary Socialism
must use these mass industrial revolts to broaden the strike, to make
it general and militant; use the strike for political objectives, and,
finally, develop the mass political strike against Capitalism and the
state. Revolutionary Socialism must base itself on the mass struggles

55627°—25——42

bilizing the " power of the proletariat in action," through
mass industrial revolts developing into mass political
strikes and " revolutionary mass action ", for the purpose
of conquering and destroying the parliamentary state and
establishing in its place, through a " revolutionary dic-
tatorship of the proletariat ", the system of Communist
Socialism. The then recent strikes in Seattle and Win-
nipeg [3] were cited as instances of a development already
verging on revolutionary action and suggestive of prole-

---

of the proletariat, engage directly in these struggles while emphasiz-
ing the revolutionary purposes of Socialism and the proletarian
movement. The mass strikes of the American proletariat provide
the material basis out of which to develop the concepts and action
of revolutionary Socialism. . . . Our task . . . is to articu-
late and organize the mass of the unorganized industrial proletariat,
which constitutes the basis for a militant Socialism. The struggle
for the revolutionary industrial unionism of the proletariat becomes
an indispensable phase of revolutionary Socialism, on the basis of
which to broaden and deepen the action of the militant proletariat,
developing reserves for the ultimate conquest of power. . . .
Revolutionary Socialism adheres to the class struggle because through
the class struggle alone—the mass struggle—can the industrial
proletariat secure immediate concessions and finally conquer power
by organizing the industrial government of the working class. The
class struggle is a political struggle . . . in the sense that its
objective is political—the overthrow of the political organization
upon which capitalistic exploitation depends, and the introduction
of a new social system. The direct objective is the conquest by the
proletariat of the power of the state. Revolutionary Socialism does
not propose to ' capture ' the bourgeois parliamentary state, but to
conquer and destroy it. Revolutionary Socialism, accordingly, repu-
diates the policy of introducing Socialism by means of legislative
measures on the basis of the bourgeois state. . . . It proposes to
conquer by means of political action . . . in the revolutionary

(Footnote 2 continued on following pages.)

[3] There was testimony at the trial that " there was an extended
strike at Winnipeg commencing May 15, 1919, during which the pro-
duction and supply of necessities, transportation, postal and
telegraphic communication and fire and sanitary protection were
suspended or seriously curtailed."

tarian dictatorship, in which the strike-workers were
" trying to usurp the functions of municipal govern-
ment "; and revolutionary Socialism, it was urged, must
use these mass industrial revolts to broaden the strike,
make it general and militant, and develop it into mass
political strikes and revolutionary mass action for the an-
nihilation of the parliamentary state.

At the outset of the trial the defendant's counsel
objected to the introduction of any evidence under the

Marxian sense, which does not simply mean parliamentarism, but the
*class action* of the proletariat *in any form* having as its objective
the conquest of the power of the state. . . . Parliamentary action
which emphasizes the implacable character of the class struggle is an
indispensable means of agitation. . . . But parliamentarism can-
not conquer the power of the state for the proletariat. . . . It is
accomplished, not by the legislative representatives of the proletariat,
but by *the mass power of the proletariat in action.* The supreme
power of the proletariat inheres in the *political mass strike,* in using
the industrial mass power of the proletariat for political objectives.
Revolutionary Socialism, accordingly, recognizes that the supreme
form of proletarian political action is *the political mass strike.*
. . . The power of the proletariat lies fundamentally in its con-
trol of the industrial process. The mobilization of this control in
action against the bourgeois state and Capitalism means the end of
Capitalism, the initial form of the revolutionary mass action that will
conquer the power of the state. . . . The revolution starts with
strikes of protest, developing into mass political strikes and then into
revolutionary mass action for the conquest of the power of the state.
Mass action becomes political in purpose while extra-parliamentary
in form; it is equally a process of revolution and the revolution itself
in operation. The final objective of mass action is the conquest of
the power of the state, the annihilation of the bourgeois parliamentary
state and the introduction of the transition proletarian state, func-
tioning as a revolutionary dictatorship of the proletariat. . . .
The bourgeois parliamentary state is the organ of the bourgeoisie for
the coercion of the proletariat. The revolutionary proletariat must,
accordingly, destroy this state. . . . It is therefore necessary that
the proletariat organize its own state *for the coercion and suppression
of the bourgeoisie.* . . . Proletarian dictatorship is a recognition
of the necessity for a revolutionary state to coerce and suppress the

indictment on the grounds that, as a matter of law, the
Manifesto "is not in contravention of the statute," and
that "the statute is in contravention of" the due process
clause of the Fourteenth Amendment. This objection
was denied. They also moved, at the close of the evi-
dence, to dismiss the indictment and direct an acquittal
"on the grounds stated in the first objection to evidence",

bourgeoisie; it is equally a recognition of the fact that, in the Com-
munist reconstruction of society, the proletariat as a class alone
counts. . . . The old machinery of the state cannot be used by
the revolutionary proletariat. It must be destroyed. The proletariat
creates a new state, based directly upon the industrially organized
producers, upon the industrial unions or Soviets, or a combination of
both. It is this state, alone, functioning as a dictatorship of the
proletariat, that can realize Socialism. . . . While the dictator-
ship of the proletariat performs its negative task of crushing the old
order, it performs the positive task of constructing the new. Together
with the government of the proletarian dictatorship, there is developed
a new 'government,' which is no longer government in the old sense,
since it concerns itself with the management of production and not
with the government of persons. Out of workers' control of industry,
introduced by the proletarian dictatorship, there develops the com-
plete structure of Communist Socialism,—industrial self-government
of the communistically organized producers. When this structure is
completed, which implies the complete expropriation of the bourgeoisie
economically and politically, the dictatorship of the proletariat ends,
in its place coming the full and free social and individual autonomy
of the Communist order. . . . It is not a problem of immediate
revolution. It is a problem of the immediate revolutionary struggle.
The revolutionary epoch of the final struggle against Capitalism may
last for years and tens of years; but the Communist International
offers a policy and program immediate and ultimate in scope, that
provides for the immediate class struggle against Capitalism, in its
revolutionary implications, and for the final act of the conquest of
power. The old order is in decay. Civilization is in collapse. The
proletarian revolution and the Communist reconstruction of society—
*the struggle for these*—is now indispensable. This is the message
of the Communist International to the workers of the world. The
Communist International calls the proletariat of the world to the final
struggle!"

and again on the grounds that " the indictment does not charge an offense " and the evidence " does not show an offense." These motions were also denied.

The court, among other things, charged the jury, in substance, that they must determine what was the intent, purpose and fair meaning of the Manifesto; that its words must be taken in their ordinary meaning, as they would be understood by people whom it might reach; that a mere statement or analysis of social and economic facts and historical incidents, in the nature of an essay, accompanied by prophecy as to the future course of events, but with no teaching, advice or advocacy of action, would not constitute the advocacy, advice or teaching of a doctrine for the overthrow of government within the meaning of the statute; that a mere statement that unlawful acts might accomplish such a purpose would be insufficient, unless there was a teaching, advising and advocacy of employing such unlawful acts for the purpose of overthrowing government; and that if the jury had a reasonable doubt that the Manifesto did teach, advocate or advise the duty, necessity or propriety of using unlawful means for the overthrowing of organized government, the defendant was entitled to an acquittal.

The defendant's counsel submitted two requests to charge which embodied in substance the statement that to constitute criminal anarchy within the meaning of the statute it was necessary that the language used or published should advocate, teach or advise the duty, necessity or propriety of doing " some definite or immediate act or acts " of force, violence or unlawfulness directed toward the overthrowing of organized government. These were denied further than had been charged. Two other requests to charge embodied in substance the statement that to constitute guilt the language used or published must be " reasonably and ordinarily calculated to incite certain persons " to acts of force, violence or unlawfulness,

with the object of overthrowing organized government.
These were also denied.

The Appellate Division, after setting forth extracts
from the Manifesto and referring to the Left Wing and
Communist Programs published in the same issue of the
Revolutionary Age, said: [4] "It is perfectly plain that the
plan and purpose advocated . . . contemplate the
overthrow and destruction of the governments of the
United States and of all the States, not by the free action
of the majority of the people through the ballot box in
electing representatives to authorize a change of govern-
ment by amending or changing the Constitution, . . .
but by immediately organizing the industrial proletariat
into militant Socialist unions and at the earliest oppor-
tunity through mass strike and force and violence, if
necessary, compelling the government to cease to func-
tion, and then through a proletarian dictatorship, taking
charge of and appropriating all property and administer-
ing it and governing through such dictatorship until such
time as the proletariat is permitted to administer and
govern it. . . . The articles in question are not a
discussion of ideas and theories. They advocate a doc-
trine deliberately determined upon and planned for mili-
tantly disseminating a propaganda advocating that it is
the duty and necessity of the proletariat engaged in
industrial pursuits to organize to such an extent that, by
massed strike, the wheels of government may ultimately
be stopped and the government overthrown . . ."

The Court of Appeals held that the Manifesto "advo-
cated the overthrow of this government by violence, or
by unlawful means." [5] In one of the opinions represent-

[4] 195 App. Div. 773, 782, 790.

[5] Five judges, constituting the majority of the court, agreed in this
view. 234 N. Y. 132, 138. And the two judges, constituting the
minority—who dissented solely on a question as to the construction
of the statute which is not here involved—said in reference to the

ing the views of a majority of the court,[6] it was said: "It will be seen . . . that this defendant through the manifesto . . . advocated the destruction of the state and the establishment of the dictatorship of the proletariat. . . . To advocate . . . the commission of this conspiracy or action by mass strike whereby government is crippled, the administration of justice paralyzed, and the health, morals and welfare of a community endangered, and this for the purpose of bringing about a revolution in the state, is to advocate the overthrow of organized government by unlawful means." In the other [7] it was said: "As we read this manifesto . . . we feel entirely clear that the jury were justified in rejecting the view that it was a mere academic and harmless discussion of the advantages of communism and advanced socialism" and "in regarding it as a justification and advocacy of action by one class which would destroy the rights of all other classes and overthrow the state itself by use of revolutionary mass strikes. It is true that there is no advocacy in specific terms of the use of . . . force or violence. There was no need to be. Some things are so commonly incident to others that they do not need to be mentioned when the underlying purpose is described."

And both the Appellate Division and the Court of Appeals held the statute constitutional.

The specification of the errors relied on relates solely to the specific rulings of the trial court in the matters hereinbefore set out.[8] The correctness of the verdict is not

---

Manifesto: "Revolution for the purpose of overthrowing the present form and the established political system of the United States government by direct means rather than by constitutional means is therein clearly advocated and defended . . ." p. 154.

[6] Pages 141, 142.

[7] Pages 149, 150.

[8] Exceptions to all of these rulings had been duly taken.

questioned, as the case was submitted to the jury. The sole contention here is, essentially, that as there was no evidence of any concrete result flowing from the publication of the Manifesto or of circumstances showing the likelihood of such result, the statute as construed and applied by the trial court penalizes the mere utterance, as such, of "doctrine" having no quality of incitement, without regard either to the circumstances of its utterance or to the likelihood of unlawful sequences; and that, as the exercise of the right of free expression with relation to government is only punishable "in circumstances involving likelihood of substantive evil," the statute contravenes the due process clause of the Fourteenth Amendment. The argument in support of this contention rests primarily upon the following propositions: 1st, That the "liberty" protected by the Fourteenth Amendment includes the liberty of speech and of the press; and 2nd, That while liberty of expression "is not absolute," it may be restrained "only in circumstances where its exercise bears a causal relation with some substantive evil, consummated, attempted or likely," and as the statute "takes no account of circumstances," it unduly restrains this liberty and is therefore unconstitutional.

The precise question presented, and the only question which we can consider under this writ of error, then is, whether the statute, as construed and applied in this case by the state courts, deprived the defendant of his liberty of expression in violation of the due process clause of the Fourteenth Amendment.

The statute does not penalize the utterance or publication of abstract "doctrine" or academic discussion having no quality of incitement to any concrete action. It is not aimed against mere historical or philosophical essays. It does not restrain the advocacy of changes in the form of government by constitutional and lawful means. What it prohibits is language advocating, advising or teaching

the overthrow of organized government by unlawful means. These words imply urging to action. Advocacy is defined in the Century Dictionary as: "1. The act of pleading for, supporting, or recommending; active espousal." It is not the abstract "doctrine" of overthrowing organized government by unlawful means which is denounced by the statute, but the advocacy of action for the accomplishment of that purpose. It was so construed and applied by the trial judge, who specifically charged the jury that: "A mere grouping of historical events and a prophetic deduction from them would neither constitute advocacy, advice or teaching of a doctrine for the overthrow of government by force, violence or unlawful means. [And] if it were a mere essay on the subject, as suggested by counsel, based upon deductions from alleged historical events, with no teaching, advice or advocacy of action, it would not constitute a violation of the statute. . . ."

The Manifesto, plainly, is neither the statement of abstract doctrine nor, as suggested by counsel, mere prediction that industrial disturbances and revolutionary mass strikes will result spontaneously in an inevitable process of evolution in the economic system. It advocates and urges in fervent language mass action which shall progressively foment industrial disturbances and through political mass strikes and revolutionary mass action overthrow and destroy organized parliamentary government. It concludes with a call to action in these words: "The proletariat revolution and the Communist reconstruction of society—*the struggle for these*—is now indispensable. . . . The Communist International calls the proletariat of the world to the final struggle!" This is not the expression of philosophical abstraction, the mere prediction of future events; it is the language of direct incitement.

The means advocated for bringing about the destruction of organized parliamentary government, namely, mass in-

dustrial revolts usurping the functions of municipal government, political mass strikes directed against the parliamentary state, and revolutionary mass action for its final destruction, necessarily imply the use of force and violence, and in their essential nature are inherently unlawful in a constitutional government of law and order. That the jury were warranted in finding that the Manifesto advocated not merely the abstract doctrine of overthrowing organized government by force, violence and unlawful means, but action to that end, is clear.

For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress— are among the fundamental personal rights and " liberties " protected by the due process clause of the Fourteenth Amendment from impairment by the States. We do not regard the incidental statement in *Prudential Ins. Co.* v. *Cheek*, 259 U. S. 530, 543, that the Fourteenth Amendment imposes no restrictions on the States concerning freedom of speech, as determinative of this question.[9]

It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom. 2 Story on the Constitution, 5th ed., § 1580, p. 634; *Robertson* v. *Baldwin*, 165 U. S. 275, 281; *Patterson* v. *Colorado*, 205 U. S. 454, 462; *Fox* v. *Washington*, 236

---

[9] Compare *Patterson* v. *Colorado*, 205 U. S. 454, 462; *Twining* v. *New Jersey*, 211 U. S. 78, 108; *Coppage* v. *Kansas*, 236 U. S. 1, 17; *Fox* v. *Washington*, 236 U. S. 273, 276; *Schaefer* v. *United States*, 251 U. S. 466, 474; *Gilbert* v. *Minnesota*, 254 U. S. 325, 338; *Meyer* v. *Nebraska*, 262 U. S. 390, 399; 2 Story On the Constitution, 5th Ed., § 1950, p. 698.

U. S. 273, 276; *Schenck* v. *United States,* 249 U. S. 47, 52;
*Frohwerk* v. *United States,* 249 U. S. 204, 206; *Debs* v.
*United States,* 249 U. S. 211, 213; *Schaefer* v. *United
States,* 251 U. S. 466, 474; *Gilbert* v. *Minnesota,* 254
U. S. 325, 332; *Warren* v. *United States,* (C. C. A.) 183
Fed. 718, 721. Reasonably limited, it was said by Story
in the passage cited, this freedom is an inestimable privi-
lege in a free government; without such limitation, it
might become the scourge of the republic.

That a State in the exercise of its police power may
punish those who abuse this freedom by utterances inim-
ical to the public welfare, tending to corrupt public
morals, incite to crime, or disturb the public peace, is not
open to question. *Robertson* v. *Baldwin, supra,* p. 281;
*Patterson* v. *Colorado, supra,* p. 462; *Fox* v. *Washington,
supra,* p. 277; *Gilbert* v. *Minnesota, supra,* p. 339; *People*
v. *Most,* 171 N. Y. 423, 431; *State* v. *Holm,* 139 Minn.
267, 275; *State* v. *Hennessy,* 114 Wash. 351, 359; *State*
v. *Boyd,* 86 N. J. L. 75, 79; *State* v. *McKee,* 73 Conn.
18, 27. Thus it was held by this Court in the *Fox Case,*
that a State may punish publications advocating and
encouraging a breach of its criminal laws; and, in the
*Gilbert Case,* that a State may punish utterances teaching
or advocating that its citizens should not assist the United
States in prosecuting or carrying on war with its public
enemies.

And, for yet more imperative reasons, a State may
punish utterances endangering the foundations of organ-
ized government and threatening its overthrow by unlaw-
ful means. These imperil its own existence as a con-
stitutional State. Freedom of speech and press, said
Story (*supra*) does not protect disturbances to the public
peace or the attempt to subvert the government. It does
not protect publications or teachings which tend to sub-
vert or imperil the government or to impede or hinder it
in the performance of its governmental duties. *State* v.

*Holm, supra,* p. 275. It does not protect publications. prompting the overthrow of government by force; the punishment of those who publish articles which tend to destroy organized society being essential to the security of freedom and the stability of the State. *People* v. *Most, supra,* pp. 431, 432. And a State may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several States, by violence or other unlawful means. *People* v. *Lloyd,* 304 Ill. 23, 34. See also, *State* v. *Tachin,* 92 N. J. L. 269, 274; and *People* v. *Steelik,* 187 Cal. 361, 375. In short this freedom does not deprive a State of the primary and essential right of self preservation; which, so long as human governments endure, they cannot be denied. *Turner* v. *Williams,* 194 U. S. 279, 294. In *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 419, it was said: "The safeguarding and fructification of free and constitutional institutions is the very basis and mainstay upon which the freedom of the press rests, and that freedom, therefore, does not and cannot be held to include the right virtually to destroy such institutions."

By enacting the present statute the State has determined, through its legislative body, that utterances advocating the overthrow of organized government by force, violence and unlawful means, are so inimical to the general welfare and involve such danger of substantive evil that they may be penalized in the exercise of its police power. That determination must be given great weight. Every presumption is to be indulged in favor of the validity of the statute. *Mugler* v. *Kansas,* 123 U. S. 623, 661. And the case is to be considered "in the light of the principle that the State is primarily the judge of regulations required in the interest of public safety and welfare;" and that its police "statutes may only be declared unconstitutional where they are arbitrary or unreason-

able attempts to exercise authority vested in the State in the public interest." *Great Northern Ry.* v. *Clara City*, 246 U. S. 434, 439. That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial, because the effect of a given utterance cannot be accurately foreseen. The State cannot reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the State is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency. In *People* v. *Lloyd, supra,* p. 35, it was aptly said: " Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there

would be neither prosecuting officers nor courts for the enforcement of the law."

We cannot hold that the present statute is an arbitrary or unreasonable exercise of the police power of the State unwarrantably infringing the freedom of speech or press; and we must and do sustain its constitutionality.

This being so it may be applied to every utterance—not too trivial to be beneath the notice of the law—which is of such a character and used with such intent and purpose as to bring it within the prohibition of the statute. This principle is illustrated in *Fox* v. *Washington, supra,* p. 277; *Abrams* v. *United States,* 250 U. S. 616, 624; *Schaefer* v. *United States, supra,* pp. 479, 480; *Pierce* v. *United States,* 252 U. S. 239, 250, 251; [10] and *Gilbert* v. *Minnesota, supra,* p. 333. In other words, when the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such danger of substantive evil that they may be punished, the question whether any specific utterance coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration. It is sufficient that the statute itself be constitutional and that the use of the language comes within its prohibition.

It is clear that the question in such cases is entirely different from that involved in those cases where the statute merely prohibits certain acts involving the danger of substantive evil, without any reference to language itself, and it is sought to apply its provisions to language

---

[10] This reference is to so much of the decision as relates to the conviction under the third count. In considering the effect of the decisions under the Espionage Act of 1917 and the amendment of 1918, the distinction must be kept in mind between indictments under those provisions which specifically punish certain utterances, and those which merely punish specified acts in general terms, without specific reference to the use of language.

used by the defendant for the purpose of bringing about the prohibited results. There, if it be contended that the statute cannot be applied to the language used by the defendant because of its protection by the freedom of speech or press, it must necessarily be found, as an original question, without any previous determination by the legislative body, whether the specific language used involved such likelihood of bringing about the substantive evil as to deprive it of the constitutional protection. In such cases it has been held that the general provisions of the statute may be constitutionally applied to the specific utterance of the defendant if its natural tendency and probable effect was to bring about the substantive evil which the legislative body might prevent. *Schenck* v. *United States, supra,* p. 51; *Debs* v. *United States, supra,* pp. 215, 216. And the general statement in the *Schenck Case* (p. 52) that the " question in every case is whether the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils,"—upon which great reliance is placed in the defendant's argument—was manifestly intended, as shown by the context, to apply only in cases of this class, and has no application to those like the present, where the legislative body itself has previously determined the danger of substantive evil arising from utterances of a specified character.

The defendant's brief does not separately discuss any of the rulings of the trial court. It is only necessary to say that, applying the general rules already stated, we find that none of them involved any invasion of the constitutional rights of the defendant. It was not necessary, within the meaning of the statute, that the defendant should have advocated " some definite or immediate act or acts " of force, violence or unlawfulness. It was sufficient if such acts were advocated in general terms; and it was not essential that their immediate execution should.

have been advocated. Nor was it necessary that the language should have been "reasonably and ordinarily calculated to incite certain persons" to acts of force, violence or unlawfulness. The advocacy need not be addressed to specific persons. Thus, the publication and circulation of a newspaper article may be an encouragement or endeavor to persuade to murder, although not addressed to any person in particular. *Queen* v. *Most,* L. R., 7 Q. B. D. 244.

We need not enter upon a consideration of the English common law rule of seditious libel or the Federal Sedition Act of 1798, to which reference is made in the defendant's brief. These are so unlike the present statute, that we think the decisions under them cast no helpful light upon the questions here.

And finding, for the reasons stated, that the statute is not in itself unconstitutional, and that it has not been applied in the present case in derogation of any constitutional right, the judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Holmes, dissenting.

Mr. Justice Brandeis and I are of opinion that this judgment should be reversed. The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States. If I am right, then I think that the criterion sanctioned by the full Court in *Schenck* v. *United States,* 249 U. S. 47, 52, applies. "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substan-

tive evils that [the State] has a right to prevent." It is true that in my opinion this criterion was departed from in *Abrams* v. *United States,* 250 U. S. 616, but the convictions that I expressed in that case are too deep for it to be possible for me as yet to believe that it and *Schaefer* v. *United States,* 251 U. S. 466, have settled the law. If what I think the correct test is applied, it is manifest that there was no present danger of an attempt to overthrow the government by force on the part of the admittedly small minority who shared the defendant's views. It is said that this manifesto was more than a theory, that it was an incitement. Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason. But whatever may be thought of the redundant discourse before us it had no chance of starting a present conflagration. If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way.

If the publication of this document had been laid as an attempt to induce an uprising against government at once and not at some indefinite time in the future it would have presented a different question. The object would have been one with which the law might deal, subject to the doubt whether there was any danger that the publication could produce any result, or in other words, whether it was not futile and too remote from possible consequences. But the indictment alleges the publication and nothing more.