THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RUTH M. REYNOLDS ET AL., Defendants and Appellants.

No. 15456.   Argued November 5, 1953.—Decided November 17, 1954.

*F. Hernández Vargas, J. Hernández Vallé* and *Conrad Lynn* for appellants.   *J. B. Fernández Badillo, Acting Attorney General, Rafael L. Ydrach Yordán* and *Jaime García Blanco, Assistant Fiscal* and *Special Fiscal of the Supreme Court* respectively, for appellee.   *Santos P. Amadeo* for the Civil Liberties Union, as *amicus curiae.*

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Ruth M. Reynolds, Rafael Burgos Fuentes, José Mejías

422

Flores, and Eduardo López Vázquez were jointly charged in the former District Court of Puerto Rico, San Juan Section, with a violation of § 1(1) of Act No. 53 of 1948 (Spec. Sess. Laws, p. 170).[1] The information consists of two counts. The first is directed against Ruth M. Reynolds only, and it is there substantially charged that on December 18, 1949, in Arecibo, Puerto Rico, illegally, criminally, maliciously, wilfully, and knowingly, being a leader and an active member of the Nationalist Party of Puerto Rico, then and there she promoted, advocated, advised, and preached the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Insular Government of Puerto Rico and the political subdivisions thereof by force and violence, "when, while attending and taking active part in an assembly of the group known as the 'Nationalist Party of Puerto Rico,' publicly and together with the other attendants at the assembly, she promised under oath to give her life and estate to accomplish the overthrow, paralyzation, and subversion of the Insular Government of Puerto Rico

[1] This Act was amended by Act No. 13 of December 20, 1950 (Spec. Sess. Laws, p. 368). The acts charged against appellants occurred prior to the amendment. Therefore, the information charges a violation of the original Act, which provides in part as follows:

"Section 1.—The commission by any person of any of the following acts, shall constitute a felony punishable by a maximum penalty of ten (10) years imprisonment in the penitentiary, or by a maximum fine of ten thousand (10,000) dollars, or by both penalties:

"1. To promote, advocate, advise or preach, wilfully or knowingly, the necessity, desirability, or expediency of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence;

"2. To print, publish, edit, circulate, sell, distribute, or publicly exhibit, with the intent of overthrowing, paralyzing or subverting the Insular Government or any political subdivision thereof, any writing or publication by which the necessity, desirability, or convenience of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence, is promoted, advocated, advised or preached;

"3. To organize or help to organize any association, group or assembly of persons who promote, advocate, advise, or preach the overthrowing or subverting of the Insular Government, or any subdivision thereof, by means of force or violence."

and the political subdivisions hereof, and the establishment of the Republic of Puerto Rico by means of an armed revolution . . .", all of which was part of a movement aimed at accomplishing the separation of Puerto Rico from the United States by force and violence.

The second count is to the effect that all the defendants, on or about October 26 and 27, 1950, and in the municipalities of Fajardo and San Juan, promoted, advocated, advised, and preached the necessity, desirability, and expediency of overthrowing, paralyzing, and subverting the Insular Government of Puerto Rico and the political subdivisions thereof by force and violence, "at a meeting held in the municipality of Fajardo, where they boarded an automobile, bearing license plate PA 53–664, in which they carried and had at their disposal firearms and incendiary bombs, the defendants herein having left in the automobile for the city of San Juan together with other automobiles, also occupied by leaders and active members of the group known as the 'Nationalist Party of Puerto Rico,' all of which was part of a separatist movement headed by the defendants . . . and other individuals, all of whom were members of the group known as the 'Nationalist Party of Puerto Rico,' aimed at securing the separation of Puerto Rico from the United States by force and violence, and for the purpose of participating in the revolt of October 30, 1950, resulting from such separatist movement."

Ruth M. Reynolds was tried by a jury and the other codefendants by a court without a jury, after the latter waived trial by jury. However, all the defendants were tried at a single trial. The jury found Ruth M. Reynolds guilty of the first count and not guilty of the second. The presiding judge on his part acquitted José Mejías Flores and found Rafael Burgos Fuentes and Eduardo López Vázquez guilty. Ruth M. Reynolds was sentenced to serve from 2 to 6 years in the penitentiary; Burgos Fuentes from one

month to 5 years in the penitentiary; and López Vázquez from one day to 2½ years in the penitentiary. The defendants took this appeal from those sentences.[2]

Ruth M. Reynolds, appellant herein, charges the lower court with the commission of several errors.[3] However, in view of the result to be reached by us, it will suffice to consider only the error challenging the sufficiency of the evidence to support appellant's conviction. Let us therefore examine the evidence of The People which, in view of the verdict rendered, was believed by the jury.

According to that evidence, an assembly of the Nationalist Party of Puerto Rico was held on December 18, 1948 in the Navas Theater in Arecibo. Some of the leaders of that group and its president, Pedro Albizu Campos, occupied seats on the rostrum of the theater. The assembly was attended by some 500 persons, among whom was appellant Ruth M. Reynolds. The Committee on Resolutions, previously designated by Albizu Campos, announced sometime in the afternoon that it submitted to the assembly the names of Pedro Albizu Campos, Jacinto Rivera Pérez, and Raimundo Díaz Pacheco for President, Vice President, and Treasurer, respectively, of the Nationalist Party, which nominations were unanimously accepted. Thereupon Albizu Campos proceeded to make other appointments and afterwards announced that he wished to say a few words. In his speech he accused the Nationalists of being indifferent to the movement; of not doing their duty when ordered to raise funds needed by the party; of not being as patriotic

---

[2] In the appeal taken by Ruth M. Reynolds, the American Civil Liberties Union moved for and obtained leave to appear, and did appear, as *amicus curiae.*

[3] At the hearing held in this Court, the appellant withdrew the errors relative to the selection of the jury and the admission of certain evidence. The contention as to the unconstitutionality of Act No. 53 of 1948 was decided by us against her in the recent case of *People* v. *Burgos,* 75 P.R.R. 517. The American Civil Liberties Union does not question the constitutionality of the statute.

as those who gave their life for the movement; that $600 was needed by the next day to prepare the briefs of the six Nationalists convicted of evading the Selective Service, which briefs had to be filed in English in the Circuit Court of Boston.[4]   It was during this speech, clearly aimed at raising funds, that Albizu Campos urged the persons present to stand up and with their hands raised to take the following oath: "Do you swear to give your life and estate on behalf of the liberating army?   Are you willing to sacrifice your life"?   Those present stood up and with their hands raised answered that they did.   Ruth Reynolds, who occupied a seat in the third or fourth row from the entrance of the theater, took that oath.

The remainder of the evidence offered against appellant tended to prove (a) that from July 19, 1949 to November 2, 1950, she lived in the homes of Nationalists Juan Álamo

---

[4] The text of Albizu Campos' speech, as related by a witness for The People, is as follows:

" 'That the Nationalists in Puerto Rico were indifferent to the liberating movement; that Julio de Santiago, Treasurer of the Party, had done all he could, but you—referring to the assembly—cannot imagine what that poor fellow has been through.  Let me tell you that the Nationalist movement must be strengthened; that when one of you is charged with a mission, I do not wish you to go to San Juan and tell me that you have been unable to carry it out; that when an order is given to take a collection for the Nationalist Party, you are the ones who must raise the funds.  We cannot ask anything of the enemies of the liberating movement; it is not two nor three thousand dollars that we need, it is hundreds of thousands of dollars that the liberating movement needs to carry out its commitment, and that if the old members believe that they are patriots just because they attend the assemblies and meetings of the party and served their federal sentences, they are mistaken.  Manuel Suárez Díaz, who in 1936 and while still a youngster gave his life on the Capitol steps to prevent the profanation of the flag of our country, was a patriot.  López Antongiorgi, who at the age of 20 years was faced with the bullets of imperialism, was a patriot.

".    .    .    .    .    .    .    .    .

"I do not wish to hear about the four or five cadets that we have in each town.  I wish the Liberating Army to be the strongest in Puerto Rico, ready for action.  He finally said: 'I must have by tomorrow morning, in San Juan, $600 to be used in setting up the briefs in the cases of the six Nationalists convicted of evading the Selective Service, and that these briefs had to be filed in English in the Circuit Court of Boston.' "

Díaz, Carlos Vélez Rieckehoff, and Paulino Castro; (b) that she attended the different public functions held by the Nationalist Party of Puerto Rico from 1948 to 1950, and that she applauded the speakers who took part in those functions;[5] and (c) organization and purposes of the body created and affiliated with the Nationalist Party, known as "The Cadets of the Republic," and existence of the so-called "Revolutionary Phase" within the said party, composed of those Nationalists who were willing to give their life and estate for the independence of Puerto Rico, and (d) the bloody events of October 30, 1950, brought about by members of the Nationalist Party, in which Ruth M. Reynolds, appellant herein, took no active part. That is substantially the evidence which served as a basis for the verdict of guilty rendered by the jury against appellant. We shall consider later whether the verdict is supported by such evidence. We now turn to the evidence relied on by the trial judge for finding codefendants Rafael Burgos and Eduardo López Vázquez guilty.

As to the specific charge made in the information against these other codefendants, the evidence for the prosecution showed the following: On the night of October 26, 1950, the Nationalist Party was holding a meeting in Fajardo to commemorate the birth of General Valero. The Cadets of the Republic met in the morning of that day at the Avenida General Valero, and from there left for the Catholic Church of Fajardo accompanied by members of the Nationalist Party, among whom were Albizu Campos, Ruth M. Reynolds, and Burgos Fuentes. Codefendant López Vázquez

---

[5] These functions were: Annual Assembly of the Nationalist Party held on December 19, 1948, in the Ateneo; Commemoration of the "Ponce Massacre" of March 21, 1949; Commemoration of the birth of José de Diego in San Juan on April 18, 1949; Act of protest held in Guánica on July 25, 1949; Commemoration of "Grito de Lares" on September 23, 1949; Commemoration of the birth of General Valero, in Fajardo, on October 28, 1949; and Commemoration of the Discovery of Puerto Rico, in Aguada, on November 19, 1949.

was one of the cadets who took part therein and wore the uniform. When they passed in front of Valero School, Burgos Fuentes distributed flags of South American countries among the students of that school and invited them to join. From the church they went to the cemetery where they placed a wreath on the tomb of Jesús Siaca Martínez. They then returned to the town and separated until the afternoon when a meeting was held, at which Albizu Campos was the speaker. The defendants applauded his speech. At the close of the meeting, defendants Burgos Fuentes, López Vázquez, Ruth M. Reynolds, and José Mejías Flores boarded an automobile, license number PA 53–664, operated by Miguel Rosario Aulet, and left for San Juan. That vehicle was followed by others occupied by Nationalists and behind them two vehicles occupied by detectives. Upon reaching Río Piedras, one of the vehicles occupied by Nationalists passed the red signal and was chased by the detective and finally captured at Stop 26 in front of Charneco garage. A pistol was seized from Antonio Moya Vélez, driver of the vehicle. The other vehicle occupied by the defendants was stopped near the place, from which alighted Burgos Fuentes, and a pistol, a box containing 50 bullets, and one comb with 27 bullets were seized from him as he approached one of the detectives. A pistol and comb with eight other bullets were seized from one of the pockets of López Vázquez. Upon searching the vehicle occupied by the defendants, the detectives found five bottles of the so-called "Molotov Cocktail." From the trunk of the vehicle they also seized several uniforms of the cadets of the Liberating Army and a suitcase containing personal effects. From one of the drawers they seized a box of matches and a small knife about two inches long. All the defendants were arrested and taken to police headquarters. Lastly, Burgos Fuentes and López Vázquez were charged with and sentenced for violation of the Weapons Act.

The other evidence against these codefendants is practically the same as that offered against Ruth M. Reynolds, and

covers, as already recited, the activities of the Nationalist Party during a two-year period. In addition to that evidence, the evidence against Burgos Fuentes and López Vázquez tends to prove (a) that on September 23, 1950, Burgos Fuentes delivered a firearm to Ángel Colón at Heriberto Castro's residence, saying: "Take this and defend yourself on revolution day"; (b) that at two public functions held by the Nationalist Party, one in Ponce and the other in San Juan, Burgos Fuentes gave orders to the cadets of the Liberating Army to attack the police and detectives in the event the latter attacked Albizu Campos; (c) that at the close of a meeting held by the Nationalist Party on the evening of April 16, 1950, in Barrio Obrero, and while a vehicle occupied by detectives chased the vehicle boarded by Albizu Campos, a group of Nationalists, among whom were Burgos Fuentes and López Vázquez, attempted to overturn the detectives' vehicle, shouting "Down with the Sepoys!", "Down with the government!"; "We must overthrow this government"; and (d) that bombs (Molotov Cocktail) were prepared at Burgos Fuentes' farm in Cayey and several Nationalists were drilled in target-shooting.

Is that evidence sufficient to uphold a conviction under § 1 (1) of Act No. 53? We think not. We have already seen that what that subdivision prohibits is to *promote*, *advocate*, *advise*, or *preach*, wilfully or knowingly, the necessity, desirability, or expediency of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence. This language as well as that used in the other provisions of Act No. 53 is similar to the language of § 2 (a) (1), (2), and (3) of the Federal Act known as the Smith Act.[6] It is true that both statutes, in their respective fields of effectiveness, pursue an identical purpose and by those sections they

---

[6] Alien Registration Act, passed by the Congress of the United States on June 28, 1940.

prohibit and punish the same acts. Our statute is a quasi translation of the Smith Act.[7] Hence, appellants' contention that since the United States Congress had already covered the same field or matter treated in Act No. 53, our Legislature was without power to enact the latter statute. In *People* v. *Burgos, supra,* we upheld the validity of Act No. 53 and rejected appellants' contention.

█ There is no question, and the appellee seems to admit it, that the terms advocate, advise, and preach imply the use of language. The term *"abogar"*, which is the Spanish translation used in our Act of the English term "advocate", has two acceptations according to the *Diccionario de la Lengua Española,* 1949 ed., p. 5, to wit: 1. "To defend at a trial, in writing or by word of mouth. 2. fig. To intercede, to speak in favor of someone." "Advocate" is defined in the Century Dictionary as "the act of pleading for, supporting, or recommending; active espousal." *Gitlow* v. *New York,* 268 U.S. 652. The term "advocate" means, according to the Standard Dictionary: "To speak in favor of; one who espouses, defends, or vindicates any cause by argument; a pleader, upholder, as an advocate of the oppressed." See *Ex Parte Bernat,* 255 Fed. 429. That term is primarily employed in the Smith Act with that signification. *United*

---

[7] Section 2(a)(1), (2), and (3) of the Smith Act reads as follows:

"Sec. 2. (a) It shall be unlawful for any person—

"(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government;

"(2) with intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;

"(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof."

*States* v. *Schneiderman,* 106 F. Supp. 906. *"Aconsejar"* (advise) is defined in the *Diccionario de la Lengua Española, supra,* p. 18, as: "To give advice," and according to the same dictionary, p. 337, *"consejo"* (advice) means "opinion or judgment given or taken to do or not to do a thing." The term *"predicar"* (predicate), which presumably is the Spanish translation of "to teach" used in the Smith Act, means "to publish, to make a thing evident and clear. 2. To deliver a sermon. 3. To praise a person to excess. 4. fig. To reprimand a person severely for vice or defect. 5. fig. and fam. To admonish or make remarks to a person for the purpose of dissuading him from doing something." As used in the Smith Act, "to teach" means "to instruct . . . to show how . . . to guide the studies of . . ." *United States* v. *Schneiderman, supra.* Lastly, the term *"fomentar"* (promote), used in our Act as equivalent of "abet" used in the Smith Act, on which turns the prosecutor's entire argument to justify appellants' conviction, does not have in Spanish the same meaning as the latter term in English. *"Fomentar"* is defined at p. 606 of the *Diccionario de la Lengua Española* as "to apply natural or medium heat to vivify or give vigor. 2. To incite, promote, or protect something. 3. fig. To kindle, to encourage something." There is no question that this term has been used in Act No. 53 in its figurative sense, and that it means "to incite, promote, or kindle passions."

It is obvious from the foregoing that all these terms mean to incite to action, and we are inclined to decide that that is the spirit of the law. There is no question that the statute in the first subdivision of § 1 prohibits subversive propaganda by word of mouth, whether labelled to promote, advocate, advise, or preach. *People* v. *Burgos et al., supra.*

The *Fiscal* of this Court seems to admit that the mere fact of taking an oath, as was done by appellant Ruth M. Reynolds at the Arecibo assembly, or boarding an auto-

mobile wherein bombs, firearms, and uniforms of the Liberating Army were carried, as was done by Burgos Fuentes and López Vázquez, does not warrant a conviction under § 1(1) of Act No. 53. He argues, however, that "when those very facts are considered jointly with the attendant circumstances, are judged in relation to character, position, and leadership of the persons who execute them, and are measured in the light of the other activities in which they are engaged, of their former acts, of the character, finality, and purpose of the entity to which they are affiliated, and of the activities and teachings of the coleaders in that group, such acts cease to be innocent and become criminal culpable acts executed for the sole and deliberate purpose of promoting, advocating, and preaching the overthrow of the government by violence and force.

"It was the facts above recited, and not as alleged by appellants in their briefs, what was *imputed* and *proved* in the respective charges in which defendants-appellants were found guilty of violation of Act No. 53, *supra*."

The *Fiscal* might be right if appellants had been accused and convicted of belonging to or being affiliated with a subversive association with knowledge of its purpose, or of a conspiracy to commit the different acts prohibited by Act No. 53. However, The People was bound, under the information filed against appellants, to prove that they promoted, advocated, advised, or preached something which the law prohibits, namely, the necessity, desirability, and propriety of overthrowing, paralyzing, or destroying the Government of Puerto Rico by force or violence. Neither the oath taken by Ruth Reynolds nor her affiliation with the Nationalist Party, nor her attendance at different public functions held by that group, can be branded as criminal under subd. 1 of Act No. 53. We are not deciding here whether or not the activities in which appellants are engaged constitute some other crime under Act No. 53. Our decision is confined to the facts appearing from the record of this case. Such facts,

we repeat, do not constitute the offense charged against the appellants.

In view of the foregoing, the judgments appealed from will be reversed and another entered acquitting defendants-appellants.