No. 1011.   Norton et al. v. Discipline Committee of East Tennessee State University et al.   C. A. 6th Cir.   Certiorari denied. ■

Mr. Justice Marshall, with whom Mr. Justice Douglas and Mr. Justice Brennan join, dissenting.

Petitioners were suspended as students at East Tennessee State University for distributing leaflets critical of the university administration.   They brought an action in federal district court under 42 U. S. C. § 1983 seeking reinstatement and expungement of the records of their suspension, claiming that their rights to freedom of speech and procedural due process had been violated. The District Court denied the requested relief after holding a full evidentiary hearing, and the Court of Appeals affirmed, Judge Celebrezze dissenting.   419 F. 2d 195 (C. A. 6th Cir. 1969).   I would grant certiorari.

The pamphlets involved in this case were published and distributed by students angered by what they regarded as the backward policies of the university administration and the apathy of their fellow students toward these policies.   They criticize, often in a crude and sarcastic tone, the positions of the administration on such matters as dress, social regulations, ROTC, campus police behavior, and censorship of the college newspaper.   They go on to draw unfavorable comparisons between the response of students at East Tennessee and the response of other students in Czechoslovakia, France, and elsewhere in this country, and call upon students to "stand up and fight" for their "constitutional right to protest, demonstrate, and demand their rights."*

---

*The pamphlets are reproduced in full as an appendix to the opinion of the Court of Appeals, 419 F. 2d, at 201.

No charges were brought against these students that the time, place, or manner of distribution was in any way improper. The sole charge was based squarely on the content of the pamphlets—namely, that they were "of a false, seditious and inflammatory nature." There is no evidence that the pamphlets created any disturbance on campus, nor is there any concrete evidence from which one could infer any substantial danger that they would. Rather there is only the conclusory testimony of university officials that the pamphlets "could conceivably" have caused an eruption, and reference to "fears that we might have serious consequences." *Id.,* at 197. The only support given to these assertions is the description of an incident in which some 25 students visited the dean after the pamphlets were circulated and stated that they "wanted to get rid of this group of agitators." *Id.,* at 199.

It seems to me altogether too late in the constitutional history of this country to argue that individuals can properly be punished for pamphleteering in these circumstances. These pamphlets are similar in some ways to the broadsides circulated by popular writers in England and the Colonies, official suppression of which helped lead to adoption of the First Amendment; to the writings of Republican polemicists, against which the Sedition Act prosecutions were aimed—prosecutions this Court has said violated the First Amendment, *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 273–276 (1964); and to leaflets distributed by protesters during the First World War and the 1920's, which evoked the classic opinions of Holmes and Brandeis, since vindicated by history, upon which so much of our law of free speech and the press is based. *Abrams* v. *United States,* 250 U. S. 616, 624 (1919) (Holmes, J., dissenting); *Gitlow* v. *New York,* 268 U. S. 652, 672 (1925) (Holmes, J., dis-

senting); cf. *Whitney* v. *California,* 274 U. S. 357, 372 (1927) (Brandeis, J., concurring).

Indeed many of these older examples of the pamphleteering art were far cruder in tone and more inflammatory in content than the rather mild invocations of student protest before us here. Where such writings are suppressed, they are normally called "seditious" and "inflammatory," and legal action against them is justified— as it was here—on the ground that they constitute an "incitement" to crime or other disturbance that the offended officials have a right or duty to prevent. But to accept that formula without close examination of the facts would be to submerge the First Amendment altogether, for as Mr. Justice Holmes said, in words that are often quoted but at least as often disregarded, "[e]very idea is an incitement." *Gitlow* v. *New York, supra,* at 673. On this record, there was nothing approaching incitement of the kind that could constitutionally be punished as extending beyond the realm of speech into that of action. In their own testimony, the university officials demonstrated no more than the sort of "undifferentiated fear or apprehension of disturbance," which, as we held in *Tinker* v. *Des Moines School District,* 393 U. S. 503, 508 (1969), "is not enough to overcome the right to freedom of expression" even in the context of a classroom and as applied to high school rather than college students.

I cannot believe that this Court would hesitate one moment before striking down a criminal conviction based upon these pamphlets, or for that matter a civil judgment, or a prior restraint by injunction or administrative order against their distribution. This case differs in that the distribution took place upon a campus, the authors were college students, and the sanction was suspension from the university. As to the last point, it seems clear that suspension is punishment, and that punishment for

speech is "abridgment" in the constitutional sense. *Tinker* v. *Des Moines School District, supra.* As to the former two points, they do not change the case. "The first amendment applies with full vigor on the campus of a public university." Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027, 1037 (1969). Officials of public universities wield the powers of the State, and in my view they are no more free than policemen or prosecutors to punish speech because it is rude or disrespectful, or because it causes in them vague apprehensions, or because for any other reason they do not like its content.

Student protesters are unpopular today, and the activities of some of them fall far outside any plausible construction of the constitutional guarantees of free expression. There is a tendency to lump together the burning of buildings and the peaceful but often unpleasantly sharp expression of discontent. It seems to me most important that the courts should distinguish between the two with particular care in these days, when officials under the pressure of events and public opinion are tempted to blur the distinction. Our system promises to college students as to everyone else that they may have their say, and when it breaks that promise it gives aid and comfort to those who say that it is a sham.