## Commonwealth v. Goodman et al.

*Harry Felix*, assistant district attorney, for Commonwealth.

*David Wallerstein* and *Isadore Katz*, for defendants.

REED, P. J., O. C., forty-seventh judicial district, specially presiding, September 28, 1931.—The defendants were jointly indicted and convicted of sedition. At the time of the trial the Commonwealth adduced evidence that these defendants were distributing certain circulars, to which was attached a slip of paper which reads as follows:

"Unemployed Workers                      Employed Workers.

"Come to     D E M O N S T R A T I O N     on International
   The                                         Unemployment Day.

"Wednesday, February 25, 12 noon,
"Assemble at Independence Square
to March to City Hall.
"Join with WORKERS throughout the World."

And the circular to which the slip was attached reads as follows:
"UNITE THE MASSES IN THE STRUGGLE
FOR THE UNEMPLOYED!
"An Open Letter to the Central Committee of the
Communist Party of America

"Unity of action by the working masses in the struggle for the unemployed millions requires first of all united action of the workers vanguard. The National Committee of the Communist League (the Left Opposition) is in favor of such a unity of action. As a means of bringing it about we submit to you the following analysis of the problem and a concrete program of action. We ask your serious consideration, and that of all Party members and class conscious workers, to this appeal for a common struggle.

"Unemployment is increasing and with it increases the inability of the capitalist system to provide the workers with the means of existence. The number of workers who search in vain for a job mounts ever higher. This is a problem of great proportions for the American working class movement, and particularly of its revolutionary section, the Communists.

"The crisis still continues in its downward sweep. As yet there is no change in this course. Even the bourgeois economic experts are extremely cautious in their predictions. But they have with brutal frankness demanded a further reduction in the general cost of production, which means essentially further wage cuts. The capitalist owners of industry utilize the unemployment situation to play the unemployed against the employed. They see in the situation an opportunity to force downward the standard of living of the workers in order to increase their own profits. From the standpoint of the proletariat the organization of a militant movement of resistance, uniting the widest masses of workers, stands first on the agenda.

"It is not only America's involvement in world economy that has produced the present crisis. It grows, the same as any former crisis, with deadly precision out of the capitalist system of production itself. This must not be forgotten. Ever so often a crisis recurs when the production cycle reaches the saturation point and the market is glutted. This is a fundamental contradiction of capitalism. In recent years rationalization and speed-up of the workers has rapidly increased the productive capacity. This only made the contradiction more acute. The result has been a great excess of means of production on the one hand, and an excess of laborers without employment and without means of existence on the other.

"To present this as the final crisis of American capitalism would be false. It is still the world dominant power within a declining capitalist imperialism. It is preparing now by all possible means to climb out of its economic difficulties upon the backs of the workers of America and abroad. But so much more, in order to maintain its existence, does it need an industrial reserve army—the unemployed. This army will hence be with us as a permanent phenomenon; millions of workers condemned to remain without work and without means of existence.

"There will be more crises of capitalist production. They have already become world wide in character. The ranks of the unemployed are augmented everywhere, except in Russia where capitalist unemployment has disappeared. Within the capitalist world the contradictions are thus growing and multiplying; the class struggle will increase in intensity. *There can be no solution to the unemployment problem under capitalism. The solution can be found only in the socialist revolution, and finally only on a world scale.*

"In its ruthless efforts to find a way out American capitalism has embarked upon its savage campaign of slashing wages and crushing any workers' resistance. Its main fire is concentrated on the Communist vanguard. In the serious matter of correct Communist policy for the unemployment problem this outstanding feature of the moment must be given first recognition. Sec-

ondly, we must recognize the present defensive character of the general working class movement. There is not a 'widespread workers radicalization,' nor a 'revolutionary upsurge of the American masses' at the present time. To proceed from such a fictitious analysis can lead only to fundamentally false conclusions and isolation of the Communist forces. But the situation is full of promising potentialities for a rise of the labor movement, for its entering into more active resistance and struggle for its needs. By means of a correct policy the Communist forces can connect up with this main stream, they can help to prepare effectively for this new rise and give to it a positive direction.

"The endeavor to keep the unemployment movement within the narrow bounds of the Trade Union Unity League is wrong. This policy hems in the movement instead of broadening it. It is false to center the unemployment program, and the activities and demonstrations, around the deceptive opportunist petition campaign to Congress. And it is doubly false to represent the Social Insurance bill as a panacea for unemployment. Such departures from Marxism only create reformist illusion. A militant struggle for real and immediate relief is indispensable, and this requires the closest unity of employed and unemployed. The slogan of 'hunger marches,' at a time when this unity is far from established, may tend to separate the unemployed from the employed and thus to narrow the struggle.

"The net result of these errors is a situation in which the demonstrations become demonstrations only of the small Communist vanguard as an easy target for policemens' clubs, while the main body of the working masses stands aside as passive bystanders. We must follow the opposite road, we must first of all endeavor to unite the working masses, with the Communist vanguard in the lead, in the struggle for the unemployed. In this struggle, those at work, suffering under the ravages and degradations of the capitalist offensive, must have their place side by side with the unemployed. Given such direction, no policemens' clubs can beat back the movement.

"Our principal object is and remains the proletarian revolution. Our agitation and tactics must naturally vary to correspond with the objective devolopments, with the rhythms of the ebbs and flows, the upward and the downward curves of the working class movement. In each specific stage of development, our tactics must lay the basis for correct preparation and direction of the next one. Correct tactics lead toward the revolutionary goal. Wrong tactics lead away from it and strengthen the enemy. A correct approach to the problem of ameliorating the working class needs of today, and now so acutely pressing, prepares for the battles of the rising labor movement tomorrow. Agitation slogans and immediate demands can present no solution in themselves and should not be so designed. They are, by the very nature of the class struggle, strictly limited in their character. That is, they can offer means of temporary amelioration. And they must be a help to unite the workers on the basis of their common interests and to set them into motion against their class enemy. They cannot solve the problem. Only the proletarian revolution can do that.

"We propose unity of action of the Communist forces and, in advancing the following concrete program, we offer our fraternal coöperation with the official Communist Party in the struggle for the unemployed.

"1. Common recognition of the capitalist offensive and of the defensive character of the general working class movement as the outstanding feature of the present moment. This requires a line of tactics which take this feature of the situation into account. Proceeding from this our tactics must natu-

rally grow in boldness in preparation for the next stage when workers' struggles can pass over to the offensive.

"2. The central immediate demand must be the *six hour day without reduction in pay.* More than any other demand, this has the quality both of offering real and tangible improvement of the workers condition and becomes a means to unite the working masses and set them into motion against their enemy. The Communist forces must take upon themselves particularly the duty of *arousing the existing labor unions and workers organizations* and welding them together into a powerful movement for the shorter workday.

"3. It is essential for the working class also to fight against the murderous capitalist rationalization and speed-up of the workers. Similarly to fight for immediate unemployment relief, and for a system of unemployment insurance at the expense of the capitalist and their governments. In this connection, we must always emphasize that the workers can obtain even the smallest measures of relief and reform only through direct pressure of their mass numbers.

"4. It is essential that the unemployment movement adopt the slogan and fight for extension of large scale credits from U. S. capitalism to the Soviet Union. The further success of the great industrialization progress of the Soviet Union is bound up with facilitation of an increase of supply of machinery for the immediate future from the capitalist countries. For this the Soviet Union needs credit. The orders which such credits will enable the Soviet Union to place in America will provide more work for the unemployed here. The great importance of this demand, for which we must arouse the workers to fight, consists in the fact that it unites the struggle of the American workers for their most pressing immediate needs with the industrialization program of the Soviet Union. Thereby it cements the bonds of American workers with the Soviet Union and makes them real participants in its struggle toward socialism.

"5. To actually provide the broadest possible basis for the movement, Unemployment Councils should be organized as genuine united front bodies. Such councils when growing out of the movement struggling unitedly for the needs of the unemployed and against the capitalist offensive can become genuinely representative of the masses. The official Communist Party must revive and apply the united front as Lenin taught them. This means, in the present situation, to make direct proposals to the trade unions, the socialist party and the workers organizations for a common struggle for the above demands. On the basis of such proposals a strong agitation should commence among the workers in the ranks of these organizations. The fact that the reactionary leaders of the trade unions will reject our proposals, or refuse even to discuss them, is no reason to refrain from making them. Such an attitude on the part of the leaders will only deepen the contradictions between the bureaucracy and the workers and widen the basis for Communist influence. An energetic application of these tactics, on the basis of a realistic and correct program, will create the conditions for a real movement on the issue of unemployment. This is the need of the hour. Up to now the struggle has been a demonstration of the vanguard. It must be transformed into a mass movement under the leadership of the Communist vanguard. A correct evaluation of the situation, a correct program and the tactics of the united front are the ways to this transformation.

"6. The main duty of the Communists in the unemployment situation is, as always, to become the leading force of ever broader working masses, proceeding from the immediate needs toward the final working class goal. There

is no solution to the unemployment problem except through the proletarian revolution. In our agitation and struggles we must always make this clear.

"NATIONAL COMMITTEE
COMMUNIST LEAGUE OF AMERICA (Opposition)

"READ THE MILITANT

"Issued by the National Committee of the Communist League of America (Opposition) 84 East Tenth Street, New York, New York."

All the evidence that the Commonwealth adduced at the time of the trial was the calling of the officers who testified that they had seen the two defendants distributing among the masses these circulars, and it is claimed on the part of the Commonwealth that the distribution of this literature is in violation of the Act of Assembly of June 26, 1919, P. L. 639, defining sedition and prescribing the punishment therefor, and the amendment thereto of May 10, 1921, P. L. 435.

After the evidence had been adduced, the trial judge charged the jury as to his conception of the law of the case, and a verdict of guilty was rendered against both defendants, after which a motion in arrest of judgment was filed by counsel for the defendants, wherein they advanced several reasons for a new trial, as follows:

"1. Because the Act of June 26, 1919, P. L. 639, as amended by the Act of May 10, 1921, P. L. 435, is unconstitutional in that section 1 (c) violates the Fourteenth Amendment of the United States Constitution.

"2. Because section 1 (c) of the Sedition Act is in violation of article I, section seven, of the Constitution of the State of Pennsylvania.

"3. Because there is no evidence in this case that the defendant has committed the crime of sedition.

"4. Because the pamphlet which is attached to the indictment does not violate the Act of June 26, 1919, P. L. 639, as amended by the Act of May 10, 1921, P. L. 435."

Some time after the testimony was transcribed additional reasons were filed by counsel for the defendant which relate to the charge of the court.

The first matter to which we should give our attention is the circular which was distributed by the defendants; if the content of this paper is not seditious, then its distribution would not be in violation of the provisions of the Act of 1919, as amended by the Act of 1921. The learned counsel for the defendant argues strenuously that there is nothing contained in this circular which violates the different provisions of this act. Section one of the amended act reads, in part, as follows:

"Be it enacted, That the word 'sedition,' as used in this act, shall mean:

"Any writing, publication, printing, cut, cartoon, utterance, or conduct, either individually or in connection or combination with any other person or persons, the intent of which is:

"(a) To make or cause to be made any outbreak or demonstration of violence against this State or against the United States.

"(b) To encourage any person or persons to take any measures or engage in any conduct with a view of overthrowing or destroying or attempting to overthrow or destroy, by any force or show or threat of force, the Government of this State or of the United States.

"(c) To incite or encourage any person or persons to commit any overt act with a view to bringing the Government of this State or of the United States into hatred or contempt.

"(d) To incite any person or persons to do or attempt to do personal injury or harm to any officer of this State or of the United States, or to damage or destroy any public property or the property of any public official because of his official position.

"It shall also include:

"(e) The actual damage to, or destruction of, any public property or the property of any public official, perpetrated because the owner or occupant is in official position.

"(f) Any writing, publication, printing, cut, cartoon, or utterance which advocates or teaches the duty, necessity, or propriety of engaging in crime, violence, or any form of terrorism, as a means of accomplishing political reform or change in government.

"(g) The sale, gift, or distribution of any prints, publications, books, papers, documents, or written matter in any form, which advocates, furthers, or teaches sedition as hereinbefore defined.

"(h) Organizing or helping to organize or becoming a member of an assembly, society, or group, where any of the policies or purposes thereof are seditious as hereinbefore defined."

Now, in construing the intent of the parties who distributed these circulars, we have a right to assume that they knew their full contents, and that it was their intention that the circulars should bring about the governmental conditions advocated in the circular; and while it is true, as contended by counsel for the defendants, that any one has a perfect right to advocate a change in the government, yet in so doing they should use due care to bring such a change about by peaceable methods and not by force or riot or by destructive revolutionary methods. The very purpose of the act of assembly is to prevent riots and bloodshed and unwarranted measures which tend to destruction of property, and if the distribution of these circulars was with the intent to cause an outbreak or demonstration of violence against the state, or to encourage any person to take measures or engage in conduct with a view of overthrowing or destroying, or attempting to overthrow or destroy by threat or force the government of the state, or of the United States, or for any purpose prohibited by the act of assembly, then the defendants must be held to be guilty under the act of assembly, the jury having found as a fact that they distributed the circulars complained of, unless the act is unconstitutional, or unless the trial judge erred in charging the jury.

As to the act being unconstitutional because clause (c) violates the Fourteenth Amendment of the United States Constitution, which said amendment reads as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," we see nothing in section 1 (c) of the act of assembly relating to sedition that violates any of the provisions of the Fourteenth Amendment of the United States Constitution; nor do we find anything in this act of assembly that violates article I, section seven, of the Constitution of the State of Pennsylvania. It must be apparent to every law-abiding citizen

that in order to have decent and orderly society there must be imposed such restrictions on the conduct of the citizens as will tend to assure peace and harmony in a community instead of riots and bloodshed, and the several provisions in the Act of 1919, as amended by the Act of 1921, all tend to create a peaceable and healthy condition of society; in fact, the fundamental principles of the Constitution, both of the United States and the state, are founded upon the principles that her citizens will conduct themselves properly and in a manner that will promote their welfare and happiness; hence, the reasons filed by defendants on the ground that the act is unconstitutional should be overruled.

It is further contended on the part of the defendants that there is nothing seditious in the circular, and that calls for an authoritative definition of the word "sedition," and we find that the word sedition means: "A commotion, or the raising of a commotion, in a state, not amounting to an insurrection; conduct tending to treason, but without any overt act; excitement of discontent against the Government, or of resistance to lawful authority;" and a synonym for the word sedition is "treason." In other words, sedition is conduct which tends to treason but which falls short of it for want of an overt act. It is very clear that no good purpose could be served by the distribution of inflammatory circulars such as were being handed out by these defendants, a circular in which are found such phrases as: "Within the capitalist world the contradictions are thus growing and multiplying; the class struggle will increase in intensity. *There can be no solution to the unemployment problem under capitalism. The solution can be found only in the socialist revolution, and finally only on a world scale;*" and the further phrase: "In this struggle, those at work, suffering under the ravages and degradations of the capitalist offensive, must have their place side by side with the unemployed. Given such direction, no policemens' clubs can beat back the movement." There are many other paragraphs and sentences in this circular which evidently were intended to inflame the general public, create a spirit of unrest, and bring about a change in the government by force, or even bloodshed, in case this force would be resisted by the preservers of the peace, in other words, the police force of the government.

We conclude, therefore, that the case was for the jury, and there only remains the questions which have arisen under the exceptions as to the charge of the trial judge.

Counsel for the defendant has filed several additional reasons, wherein he complains of the charge of the court, and it is claimed that the court erred in his instruction to the jury in the use of the words contained in the Act of 1919, which provides that any writing, publication, printing, cut, cartoon, utterance or conduct, either individually or in connection or combination with any other person or persons "which tends," etc., is seditious; when he should have used the words as contained in the Act of 1921, which are "the intent of which is," etc. At the time of the trial the court's attention was not called to this change, although Mr. Wallerstein asked for a general exception to the charge. Complaint is also made to the court's charge, for the reason that certain parts of the act which were not covered by the indictment were read to the jury; that, of course, was called to the attention of the trial judge, and he replied: "It is true we read the act and we had a right to read all the act. It is true there is no evidence of that to which counsel has called attention. If you object to that, you may have an exception noted on the record." The trial judge believed that the reading of the provisions of the act of assembly under which the defendants were indicted would aid the jury in its deliberations in coming to the conclusion as to whether or not the circular in question

was distributed with the intent or for the purpose of exciting a riot, or to bring about a change in the government by force, etc., and while it may have been superfluous, yet there was nothing in the act which was read to the jury that would tend to have them come to a wrong conclusion as to the question involved.

Again, the charge is excepted to for the reason that the trial judge said to the jury: "Now, you will read this pamphlet which you will take out with you to the jury room, and it will be for you to determine whether or not these pamphlets were handed out and distributed by these defendants with a view to having an uprising or having a change in the government by means of force." This was not specially excepted to, and unless it is error, and fundamentally so, the defendants cannot take advantage of it. However, we do not believe that it is error, for the word "view" means, "mental survey; intellectual perception or examination, as, a just view of the arguments or facts in a case; mode of looking at anything, conception, opinion; judgment; as, to state ones views of a debated policy."

"No man sets himself about anything but upon some view or other which serves him for a reason:" Locke.

And another reason assigned for a new trial is that the trial judge erred in charging the jury as follows: "If you find that that was their idea, and that was the reason for distributing these pamphlets, and that there is that in the pamphlets and the reading of them that would cause an uprising such as a riot or other disturbance against the Government, then of course these defendants would be guilty of the charges against them." Again, that matter was not called to the attention of the trial judge, but the defendant has the benefit of a general exception; however, we do not believe that the jury was misled by this instruction. It is true the Act of 1921 uses the words, "the intent of which is," yet we find the definition of "intent" is: "To give effect to construction to as having a certain meaning; to construe by intendment; to design, to have a purpose in mind." And the synonyms are, "purpose, mean, design, plan, conceive." "An intent—that is, a purpose, an aim, a design—is, in jurisprudence, whatever may be said of it in metaphysics, as much an act as is a physical act performed. The one is the exertion of the power of the mind, the other the exertion of the power of the body:" First National Bank *v.* Swan, 3 Wyo. 356, 23 Pac. 743, 745. "Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused:" Spalding *v.* People, 172 Ill. 40, 49 N. E. 993, 997.

Thus, when the trial judge, in his charge, used the words complained of instead of using the exact language contained in the act of assembly, we do not believe that the jury was in any way misled to the injury of the defendants, for it was held in the case of State *v.* Clary, 24 S. C. 116, that the word "view" signifies an intent, or, in other words, is synonymous with the word intent. The appellate court in that case discusses this matter as follows:

"As to the first ground of appeal, we have only to say that we know of no rule of law or reason which requires a Circuit Judge, in defining a criminal offence, to use the precise words employed by elementary writers in giving the definition of such criminal offence. If he explains to the jury in plain language the elements necessary to constitute the offence charged, it is quite sufficient; and this we think was done in this case. To say that a certain thing was done with *a view* to commit a felony, is the same thing as to say that it was done with *intent* to commit a felony. In the connection in which the word 'view' was used, it is manifestly synoymous with the word 'intent;'

and we cannot believe it possible that even the plainest mind could have been misled by its use. Indeed, in a subsequent part of the charge the judge in effect declared that he used the word 'view' as synonymous with the word 'intent,' for he said: 'If a man breaks into a house at night with the *view* or *intention* of committing a felony, and if he is stopped the very minute he gets in, or runs away before he puts his hands upon a single thing, he would be guilty, if the criminal *intent* was there to commit a felony.' It is quite clear, therefore, that the first ground of appeal cannot be sustained."

Counsel for defendant also complains that the trial judge should have affirmed certain points that had been submitted. We have gone over these points and consider them too broad and comprehensive in the form in which they were presented to the court, and we do not believe they should have been affirmed.

We have read the circular which is the basis of this prosecution several times, and also considered all of the exceptions filed on the part of counsel for defendants, and conclude that the facts of this case are for the jury; that the court gave the jury the proper interpretation of the laws applicable to the case; and the jury having found the defendants guilty, we see no reason why a new trial should be granted; and having come to this conclusion, all of the reasons filed on the part of counsel for the defendants should be overruled.

### Order.

And now, September 26, 1931, after fully considering all matters presented to the court, all the reasons for a new trial are overruled and a new trial is denied, and the defendants are directed to appear in open court for sentence.

### Supplemental opinion.

REED, P. J., O. C., forty-seventh judicial district, specially presiding, January 30, 1932.—An opinion by the trial judge in this case was filed some time ago, and through some misunderstanding between counsel for the defendants and the court, no opportunity was given counsel for the defendants for an oral argument, and after the opinion had been filed this matter was called to the attention of the court and the case was reopened and counsel for the defendants given an opportunity to express their views by oral argument and also in a brief submitted.

Inasmuch as all of the reasons which were filed in support of a motion for a new trial and motion in arrest of judgment were considered and, to some extent, discussed in the former opinion, we do not deem it necessary in this supplemental opinion to discuss each one separately. It is contended on the part of counsel for the defendants that his clients had a right to urge in the pamphlet which was distributed the most complete and radical change in the form of government of the United States, or the State of Pennsylvania, which can be imagined, and in support thereof cites the case of Stromberg *v.* California, 283 U. S. 359. This was admitted on the part of the Commonwealth, but it is contended that the defendants by and through the circular which they were distributing were advocating force to bring about this change of government, and we believe that a fair, unbiased and impartial reading of the contents of the bill that was circulated must bring one to the conclusion that the purpose of distributing these bills was to cause an uprising of citizenry for the purpose of changing the present form of government of the United States and the State of Pennsylvania.

Complaint is made because the trial judge in his charge to the jury read certain excerpts from the circular, but at the same time it is admitted that the jury was instructed to consider all of the contents of the bill before they came to a conclusion as to the guilt or innocence of the defendants. The court's attention has also been called to the case of Fiske *v*. Kansas, 274 U. S. 380. However, a study of that case will show that the prosecution failed because the state had offered no evidence that (quoting from the syllabus) "Industrial Workers of the World advocated unlawful methods, other than a copy of the preamble of its constitution containing the language quoted in the information;" and the appellate court held, "there was no charge or evidence that defendant, in securing members, advocated crime, violence, or other unlawful acts, and hence conviction amounted to denial of due process, in violation of Const. U. S. Amend. 14."

Attention has also been called to the case of Gitlow *v*. People of New York, 268 U. S. 652. In that case a conviction was upheld by the Supreme Court of the United States; however, counsel for the defendant maintains that there is a wide difference between the circular in the case before the court and the one in the Fiske case. We cannot agree with counsel in this. Of course, the wording in the two circulars is widely different, but the intent of the parties who published and circulated them is the same; in other words, they were published and circulated for the same purpose, *i. e.*, to bring about a change in government, even by force, if it were necessary to use such methods to bring about the change.

Counsel for defendants also attacks the constitutionality of the act of assembly under which the defendants were indicted. Having touched upon this question in our former opinion, we do not deem it necessary to discuss it at length in this opinion. It will be noted, however, that the case largely relied upon by counsel for the defendants, that of Near *v*. Minnesota, 283 U. S. 697, is one in which a newspaper had criticized public officers and held them up to scandal and ridicule. It requires no argument to distinguish the difference between the criticism of a public officer and the criticism of the government. Public officers are servants of the people, either by election or appointment, and while it is true the best form of criticism is constructive criticism, yet every public officer should conduct the affairs of his office in such a manner as to reflect credit upon himself as well as upon those responsible for his securing the position which he occupies; and to deny the press the right to criticize and to call the attention of the public to any misconduct on the part of its servants would certainly have a tendency to corruption on the part of the officers, and that is why the appellate court held the act under which the defendant in the Near case was indicted to be unconstitutional; so that the opinion in that case is neither controlling nor convincing, on account of the facts being entirely different.

Our attention is also called to the case of Stromberg *v*. California, *supra*, on the question of the defendant having been found guilty on all counts in the indictment, but that is a case wherein the court held one of the provisions of the act to be unconstitutional, and that was the ground upon which a new trial was granted. In the instant case, however, we hold that the Act of 1919, under which the defendants were indicted, as amended by the Act of 1921, is constitutional.

We conclude, therefore, after having carefully considered the very able argument of counsel for the defendants, which was supplemented by an exhaustive brief, that the opinion heretofore filed in this case was in keeping with the law of the case and that the court would not be warranted either in granting the motion in arrest of judgment or in granting a new trial; and

for the reasons above stated in the original opinion, and in this supplemental opinion, both motions, the one in arrest of judgment and the one for a new trial, should be overruled and denied.

*Decree.*

And now, January 30, 1932, the motion in arrest of judgment, as well as the motion for a new trial, are overruled and denied.