In the Matter of WILLIAM J. STANTON, SR., Petitioner, against BOARD OF EDUCATION OF THE CITY OF NEW YORK, Respondent.[*]

Supreme Court, Special Term, Kings County, January 24, 1948.

*Joseph Goldstein* for petitioner.

*John P. McGrath, Corporation Counsel* (*Michael A. Castaldi, Morris Weissberg* and *Bernard Licht* of counsel), for respondent.

*Lawrence Wiseman* for American Legion, *amicus curiæ.*

FROESSEL, J. This is an application made, pursuant to article 78 of the Civil Practice Act, for an order " reviewing the determination made by the Respondent ", Board of Education of the City of New York, on October 28, 1947, in refusing to adopt a resolution which would deny the use of school buildings and grounds, after school hours, to

---

[*] See, also, *Cannon* v. *Towner*, 188 Misc. 955.— [REP.

" (1) the Communist Party,

" (2) the organization presently known as American Youth for Democracy,

" (3) any other group or organization which the Superintendent of Schools shall have reason to believe is a Communist, Nazi or Fascist group or organization, or an organization that fosters racial or religious intolerance, or is a ' front ' for any such group or organization, * * * " and for miscellaneous other relief.

Submitted with the answer are the minutes of the said meeting of October 28, 1947, in which the arguments for and against the resolution are set forth. Two members of the respondent board voted for the resolution and five were opposed. Submitted with the petition are twenty exhibits, consisting of books, pamphlets and papers, all on the subject of communism, which, however, were not before the respondent board when it deliberated upon the resolution in question.

The controversy arises out of different concepts of the First Amendment of our Federal Constitution and sections 8 and 9 of article I of our State Constitution guaranteeing " freedom of speech ", and " the right of the people peaceably to assemble." Volumes have been written upon the subject in legal literature and otherwise since the adoption of the First Amendment over a century and a half ago, yet, the interpretation of these rights with respect to new situations constantly arising must keep pace with the flexibility of changing conditions.

One concept emphasizes the right; the other concept stresses the limitations upon that right. Confusion lies in these limitations. Certainly, all well-intentioned persons agree with Cooley when he wrote in his Constitutional Limitations (8th ed., Vol. 2, p. 876), that the First Amendment to the Federal Constitution — (relating to freedom of speech) — " * * * is almost universally regarded not only as highly important, but as being essential to the very existence and perpetuity of free government. The people of the States have therefore guarded it with jealous care, by provisions of similar import in their several constitutions, and a constitutional principle is thereby established which is supposed to form a shield of protection to the free expression of opinion in every part of our land " and with the Supreme Court of the United States in *Schneiderman* v. *United States* (320 U. S. 118, 138) when it quoted Mr. Justice Holmes as follows: " * * * if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought — not free

thought for those who agree with us, but freedom for the thought that we hate."

On the other hand, it must be recognized that this right under our Constitutions is not without its limitations. Absolute freedom includes the right to impose one's will upon another even to the point of enslavement. No one can seriously contend for such freedom under our Constitutions. The rights of speech and assembly are subject to the rights of others, as well as of the State. As was said in *Gitlow* v. *People of New York* (268 U. S. 652, 666–668): "It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom. (Citing cases.) Reasonably limited, it was said by Story in the passage cited, this freedom is an inestimable privilege in a free government; *without such limitation, it might become the scourge of the republic.* \* \* \* a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means. \* \* \* In short this freedom does not deprive a State of the primary and essential right of self preservation; which, so long as human governments endure, they cannot be denied." (Italics supplied.) (To the same effect *Stromberg* v. *California*, 283 U. S. 359, 368.)

But here we are not dealing with *punishment* for the *abuse* of the right. As to individuals, numerous statutes have been enacted to provide for such punishment, a single illustration of which is the Federal and State penal legislation which forbids advocating the overthrow or destruction of a government by force or violence. (U. S. Code, tit. 18, § 10; Penal Law, § 161.) This petitioner's efforts are directed against the *exercise* of the right, before it is known whether or not it will be abused.

In *De Jonge* v. *Oregon* (299 U. S. 353, 364–365) it was held that a State statute which punishes participation in a meeting for lawful discussion of public issues, because held under the auspices of an organization which advocates the employment of unlawful means to effect industrial or political changes, is repugnant to the due process clause of the Fourteenth Amendment. Mr. Chief Justice HUGHES, writing for the court, said in that case:

"The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under

which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.

" The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." (See, also, *Schenck* v. *United States*, 249 U. S. 47, 52.)

Thus, under the law of our land, a person may believe in and proclaim a doctrine with which others may not agree, but he may not abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, disturb the public peace, endanger the foundations of organized constitutional government, or threaten its overthrow by unlawful means. (*Gitlow* v. *People of New York*, 268 U. S. 652, 667, *supra*.) For any such abuse, he is personally answerable under the many penal statutes of our land, whether acting alone or in concert with others, and the problem of discovering the offenders, notwithstanding the difficulties, rests with the law enforcement agencies of the government.

Whether our penal laws should be implemented so as to outlaw, in some measure at least, so-called subversive organizations, which are found to be a menace to our institutions, is a matter for careful legislative consideration. Many States of the union have taken action of this character by forbidding Communists and subversive groups generally to enter their candidates on State election ballots. (See, for example, 1 Pope's Digest of

Statutes of Arkansas, ch. 55, § 4910; *Field* v. *Hall,* 201 Ark. 77.) Legislation and executive orders have been " enacted and promulgated during the past several years which subject communists and their affiliates and sympathizers to loss of public office and private position, and, in some cases, even to deportation proceedings." (*Mencher* v. *Chesley,* 297 N. Y. 94, 101.) In the last cited case, in which our Court of Appeals observed: " * * * whether or not communism stands for violent overthrow of government (cf. *Bridges* v. *Wixon,* 326 U. S. 135, particularly at p. 168 [STONE, Ch. J., dissenting]) — it is undeniable that for communism and its adherents and sympathizers, there has been widespread public aversion "; it held that a false charge that one is a communist, having communist affiliations and sympathies, is basis for a libel action.

Under the present laws of this State, and despite this " widespread public aversion ", Communists may legally function as a political party or entity. And so in the present case, under our laws and until the Legislature directs otherwise, boards of education have discretion as to the allowable use of schoolhouses, within the limits of section 414 (formerly § 455) of the Education Law of this State. With the wisdom of the discretion exercised, the courts may not interfere. When the resolution in question was first proposed, a public meeting was held and forty-two persons, representing numerous organizations, presented their separate views. At an adjourned meeting, the resolution was deliberately considered by the board, and due to differences of honest opinion among men of integrity, it declined to adopt the resolution in question by a divided vote. No affirmative determination was made; no law required the board to take any specific action.

As I indicated upon the argument, the law is well established that courts will not interfere with the exercise of discretion entrusted by law to public officers or bodies unless it be clearly demonstrated that the act complained of violates a specific statute or is essentially arbitrary. (*Matter of Marburg* v. *Cole,* 286 N. Y. 202, 208; *Matter of Small* v. *Moss,* 277 N. Y. 501, 507.) No such demonstration has been made here.

Accordingly, the application is denied and the petition is dismissed. Submit order.