Hobstadtbe, J.
(dissenting). I dissent and vote to reverse the judgments of convictions.
I know that my brethren not only are tolerant of opposing views in themselves but cordially embrace the free expression of them. Indeed, such freedom of expressing all viewpoints, whether acquiescent or dissident, is not only a duty but the reward of service in a multiple court.[1] In an ancient and highly developed system of law, it was a rule that a court that was uniformly unanimous was one to be shunned — it was dissolved and its membership reconstituted. In our country dissent is regarded as salutary for the development of sound judicial principles — yesterday’s dissenters may be tomorrow’s majority.
In a notable dissent in Malloy v. Hogan (378 U. S. 1, 14-15) Mr. Justice Hablan declared: “Believing that the * * * *641 Court’s decision carries extremely mischievous, if not dangerous consequences * * * I must dissent. The importance of the issue presented and the serious incursion which the Court makes on * * * basic constitutional principles justify a full exposition of my reasons.” I regard this expression as apposite here.
Eleven defendants tried together in an omnibus trial — though none was charged with acting in concert or congregating with any of the others — have been convicted of disorderly conduct (Penal Law, § 722, subds. 2, 3).[2]
In a ease involving demonstrations by Bronx housewives against the seller of bread at alleged exorbitant prices — in the depression year 1934 — I took occasion to observe: “ The right of an individual or group of individuals to protest in a peaceable manner against injustice or oppression, actual or merely fancied, is one to be cherished and not to be proscribed in any well-ordered society. It is an essential prerogative of free men living under democratic institutions. And it is salutary for the State in that it serves as a safety valve in times of stress and strain ” (Julie Baking Co. v. Graymond, 152 Misc. 846, 847). If this was a novel proposition when uttered, it soon ceased to be such with the authoritative pronouncement by the United States Supreme Court — in 1940 — in Thornhill v. Alabama (310 U. S. 88). That such permissible demonstrations are not limited to labor disputes was rendered explicit in Bakery Drivers Local v. Wohl (315 U. S. 769).
Such freedom of expression nourishes the spirit and practice of civility. Man’s instinctive urge to violence is thus conducted into peaceful channels.[3] “ Freedom of expression is the well *642 spring of our civilization ” (Dennis v. United States, 341 U. S. 494); and in Jefferson’s felicitous phrase this includes “the arraignment of all abuses at the bar of public reason ”. “ When the channels of opinion and of peaceful persuasion are corrupted or clogged * * * political correctives can no longer be relied on and the democratic system is threatened at its most vital point.” (Jackson, The Struggle for Judicial Supremacy, 1949 ed., p. 285.)
The First Amendment is the ‘ ‘ matrix, the indispensable condition, of nearly every other form of freedom ” (Palko v. Connecticut, 302 U. S. 319, 327). Its fundamental guarantees of freedom of speech, of press, of the people to assemble peacefully and to petition for the redress of grievances, were the first of the Bill of Rights to be secured from State abridgment by the “ due process ” clause of the Fourteenth Amendment (De Jonge v. Oregon, 299 U. S. 353; Grosjean v. American Press Co., 297 U. S. 233; Gitlow v. New York, 268 U. S. 652; Hague v. C. I. O., 307 U. S. 496; see, also, Steelworkers v. Labor Bd., 376 U. S. 492 and Sullivan v. Times, 375 U. S. 803). The counterpart of the great canon is to be found in our State Constitution (art. I, §§ 8, 9).
In this light, the convictions here are ill-founded — the demonstrations against notorious and long-standing racial discrimination were within constitutional protection. Moreover, properly construed and applied, the statute against disorderly conduct was not violated. Finally, procedural irregularity and substantial error on the trial, in any event, vitiate the judgments. Preliminary to dealing with these matters — in inverse order — let us look at the record.
The incidents complained of occurred on August 1, 1963, approximately an hour apart — at about 10:00 a.m. and 11:00 a.m.— at the site of a gate leading to a public housing project then under construction at Madison and Rutgers Streets in Manhattan. Picketing had commenced at about 6:00 a.m. A large detail of police were present. By 10 o’clock members of the public were across the street, and press reporters and photographers were in the area. Wooden “ horses ” were used as boundary markers of the picketing permitted by the police. From Rutgers Street a private access road or driveway led to a wire fence containing the entrance gate to the project. The gate was kept closed except to give entry to vehicles. Rutgers Street traffic was not impeded. While passing vehicles slowed down to observe what was going on, officers in the street expedited their movement to keep the roadway clear.
*643 To traffic in clarity, we must divide the defendants into two groups; and the interests of justice require a further particularization of the individual acts of the several defendants. Defendants Penn, Pitt, Pliskow and Levine partook of the incidents at 10:00 a.m.— and they were arrested shortly after that hour. Defendants Cannon, Ramos, McKenna, Chatkin, Bloom, Rivera, and Gottlieb partook of the incidents at 11:00 a.m.— and they were arrested thereafter. The acts of the defendants differed!
The 10 o’clock incidents all took place in front of the fence bordering the project. As a cement mixing truck on the driveway approached the gate, defendants Levine, Penn, Pliskow, and Pitt sat down in front of the fence. Only one — possibly two — of these defendants sat in front of the gate; neither of the others did so. All were some 15 feet from the truck. A photograph shows all these defendants sitting quietly doing nothing. The driver of the truck testified that he heard no loud or boisterous language — they were singing. He remained in the truck when the defendants were requested to leave. Upon their refusal to do so, they were arrested and walked quietly to the police wagon.
The entire episode had taken about 15 minutes. The driver had been inconvenienced briefly; the police were not opposed. The incidents took place not on the public street but on a private driveway. There was no actual breach of the peace — nor reasonable apprehension of it!
Further clarification requires that the “eleven-o’clock” defendants now be subdivided. Two defendants sat and one defendant lay in the private driveway leading to the fence; but there was no truck or other vehicle using the driveway at the time. Two defendants sat down in front of a cement truck in the street. Several minutes later a second cement truck arrived and stopped behind the first one in the street. After this second truck, stopped not by the pickets but by the first truck, had come to a halt, the last two defendants sat down in front of the second truck. Again the defendants were told to move, were arrested when they remained silent and, without resisting arrest, walked quietly to the patrol wagon. None had used loud or boisterous language — in fact, they had remained silent — and no breach of the peace occurred. Vehicular traffic had not stopped, having been routed around the trucks by the police. Again, there was no breach of the peace nor reasonable apprehension of it.
As to defendants Ramos and Rivera, there was confusion on the trial concerning their identification; prosecution witnesses *644 placed them in different places at the same time. It was inevitable that when the trial ended this confusion still obtained; it was compounded by like factors.
The evidence applicable to the 11 o’clock incidents obtruded itself to tell against the defendants concerned in the 10 o’clock occurrence — and conversely. With the best of intentions, it was impossible to judge each defendant on his own several acts; rather he was judged in a much broader frame of evidential reference. This resulted in an adjudication of a species of guilt by association. Hence, the collective trial and condemnation of the defendants were inadmissible in principle and violative of statute (Code Crim. Pro., §§ 278, 279, 391; People v. Fringo, 13 A D 2d 887; People v. Namolik, 8 A D 2d 685; People v. Morett, 272 App. Div. 96; People v. Kanze, 200 Misc. 907; see, also, Allen v. Grella, 4 Misc 2d 93).
To be sure, counsel had stipulated that the defendants be tried together; this was on the condition, however, not only that separate verdicts be rendered in each case, but that the testimony would be applied to each defendant only to the extent that it in fact applied to him. We have seen, however, that this became virtually impossible. There were four categories — contingents— of defendants who were tried together — not even multiple individuals concerned with parallel acts during a single event. In this fact pattern, the misjoinder was so highly prejudicial and abortive of a fair trial that the interests of justice require reversal (Code Crim. Pro., § 527; People v. Namolik, supra; People v. Lombard, 4 A D 2d 666; People v. Connors, 13 Misc. 582). “ Prejudice has consistently been held to occur when * * * [joinder] embarrasses or confounds an accused in making his defense ” (Pointer v. United States, 151 U. S. 396, 403, quoted in Cross v. United States, 335 F. 2d 987, 989).
The stipulation of counsel does not save the result from condemnation; it cannot avail. Our competence supersedes it — ■ our duty transcends it! Indeed, the vice inhered in the stipulation itself — it tained the judgment ab initio l[4]
*645 The trial court committed substantial error in rejecting evidence concerning the existence and effect of racial discrimination in employment. Defendants’ acts must be judged in the context of the demonstrations then taking place — and the right to demonstrate depended on the purpose of the demonstration (Giboney v. Empire Stor. Co., 336 U. S. 490). Our Appellate Division said in Gaynor v. Rockefeller (21 A D 2d 92, 100): “ The racial policies of exclusion by some defendant unions * * * are of so long a duration and so widely known that the courts might, if they so elected, take judicial notice of the fact * * * their policies effectively bar respondents * * * from employment in particular categories. Establishing the contention as a factual truth, in a proper proceeding, would permit legal redress ”.[5] If the fact of discrimination can serve as a predicate for redress in a civil proceeding, certainly it is relevant on such matters as wilfulness, mens rea, etc., in a criminal case. What a civil forum can take judicial notice of, surely is relevant in the context of the issue presented to a criminal court. The trial court’s restriction of the defendants’ proof was grievous, reversible error.
Dealing with substantive matters, it is manifest that the defendants’ acts, judged severally as they must be, did not constitute disorderly conduct under the statute. They did not act in such manner as to cause a ‘ ‘ disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community” (People v. Most, 171 N. Y. 423, 429). The conduct sought to be deterred by the Penal Law must be considerably more serious than innocent or inoffensive action (People v. Carcel, 3 N Y 2d 327). Inconveniencing pedestrians, or vehicular traffic for that matter, does not suffice (People v. Nixon, 248 N. Y. 182, 187, 187-188); nor does lack of manners or *646 good taste (ibid., p. 185). In .this setting, only acts which, in the context of purpose, time, place and circumstances of the acts, would, if not stopped, actually engender a breach of the peace are within its ambit (People v. Perry, 265 N. Y. 362, 364; Bouie v. City of Columbia, 378 U. S. 347). Otherwise, they are not to be so held (People ex rel. Clark v. Keeper of N. Y. State Reformatory, 176 N. Y. 465).
The complaint[6] was not established by the proof — and, on the proof, there was no likelihood of a breach of the peace or disorder. Defendants were said to have obstructed traffic; yet 7 of the 11 defendants were not on a public street, they sat in a private driveway; two others sat before a truck which had theretofore come to a halt — and traffic was not seriously hampered. Defendants were charged with using loud and boisterous language; yet the proof was diametrically to the opposite. Defendants were accused of causing a crowd to collect; yet the evidence showed that the spectators had gathered long before either set of arrests. Their mere presence does not, of course, import punishable conduct within the meaning of section 722. In our metropolis, crowds are daily present to hear speakers, to watch a parade, to satisfy curiosity (People v. Kieran, 6 Misc 2d 245, 266). No violence occurred and none was threatened; and the numerous police were there since early that morning — they were not called because of the defendants ’ acts. When arrested, the defendants submitted peacefully.
Thus, fairly evaluated, the record utterly fails as an adequate predicate for a conviction under the statute. As a matter of law, guilt under it was not established in point of fact beyond a reasonable doubt. If this represents a strict view of the evidence and of the law, it is indicated in criminal cases; that course uniformly has been followed by this court. It is also becoming in an area of grave human concern.
In any event, we are constrained by supreme authority to nullify these convictions — the defendants’ conduct came within the protective shelter of the First Amendment — whatever view we might otherwise have taken of it under our State statute. (I do not doubt that the Court of Appeals would reach the same *647 conclusion under our State constitutional provision. [Art. I, §§8,9.])
We have been instructed that in interpreting a general statute regulating public conduct we are required to ‘ ‘ resolve any doubt ‘ in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain and arbitrary judicial discretion’”. (Downum v. United States, 372 U. S. 734, 738.) And that 11 a generally worded statute, when construed to punish conduct which cannot be constitutionally punished, it unconstitutionally vague.” (Wright v. Georgia, 373 U. S. 284, 293; see, also, Cafeteria Union v. Angelos, 320 U. S. 293; Stromberg v. California, 283 U. S. 359; People v. Muller, 286 N. Y. 281; Senn v. Tile Layers Union, 301 U. S. 468). No construction of a statute is admissible which involves an inhibited application. An otherwise constitutional enactment may not be unconstitutionally enforced!
Hence, the orders of policemen could not make the conduct of the defendants, otherwise lawful, unlawful. “ One cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution.” (Wright v. Georgia, supra, pp. 291-292; Henry v. City of Rock Hill, 376 U. S. 776; see, also, Lombard v. Louisiana, 373 U. S. 267; Shuttlesworth v. Birmingham, 373 U. S. 262; Johnson v. Virginia, 373 U. S. 61; People v. Galpern, 259 N. Y. 279, 281.)
And it is equally clear that the protest need not be ineffectual to be immune from penalty. It is inherent in the constitutional guarantee that protest may be sufficiently potent to bring the grievance to the attention of the public and government. (Thornhill v. Alabama, 310 U. S. 88, 96, supra.) The fact that the action was taken according to a preconceived plan does not make it unlawful if protected by the Constitution (Taylor v. Louisiana, 370 U. S. 154, 155-156); nor because of possible disorder by others (Henry v. City of Rock Hill, 376 U. S. 776).
Where abridgment of freedom of speech is asserted, the court must be scrupulous to examine the effect of the challenged arrest on this basic right (see Schneider v. State, 308 U. S. 147, 161). “ In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.” (Cantwell v. Connecticut, 310 U. S. 296, 304.) The issue, in each case, must be resolved whether the State interest has been pressed “ to a point where it has come into fatal collision with the overriding interest protected by the federal compact ” (ibid., p. 307; emphasis supplied).
Only “ When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate *648 threat to public safety, peace or order, appears ”, the State may intervene (Cantwell v. Connecticut, supra, p. 308); absent these elements, the demonstration may not be arrested (Edwards v. South Carolina, 372 U. S. 229, distinguishing Feiner v. New York, 340 U. S. 315; Niemotko v. Maryland, 340 U. S. 268; Kunz v. New York, 340 U. S. 290; Matter of Rockwell v. Morris, 12 A D 2d 272, affd. 10 N Y 2d 721, cert. den. 368 U. S. 913).
Edwards v. South Carolina (supra) decided last year, has several points of striking similarity to the facts before this court. One hundred and eighty-seven students engaged in a protest march to the State House grounds. They walked around the grounds for approximately 45 minutes, carrying placards. Vehicular traffic at a nearby street intersection was slowed down and an officer was dispatched to keep traffic moving. There were 200 to 300 onlookers, but no evidence of violence was reported. Police protection at the scene was sufficient to meet any foreseeable possibility of disorder. When the students were asked to leave, they refused and began to sing and were arrested. The -Supreme Court ruled that although their conduct constituted a breach of the peace under State law, the convictions infringed the students’ constitutional right of free speech, free assembly and freedom to petition for redress of grievances, and reversed the convictions. (Followed in Fields v. South Carolina, 375 U. S. 44; s. c. 372 U. S. 522.)
The true import of Edwards may be found in Henry v. City of Rock Hill (supra, pp. 777-778) wherein the court stated: “We now think Edwards and Fields control the result here. As in those cases, the pétitioners here, while at a place where the State’s law did not forbid them to be, were engaged in the ‘ peaceful expression of unpopular views.’ Edwards v. South Carolina, 372 U. S., at 237. They assembled in a peaceful, orderly fashion in front of the City Hall to protest segregation. They carried signs to that effect and they sang patriotic and religious songs. Although white onlookers assembled, no violence or threat of violence occurred and traffic was not disturbed. After 15 minutes of this, they were arrested for failure to disperse upon orders. Here, as in Edwards and Fields, petitioners ‘ were convicted of an offense so generalized as to be, in the words of the South Carolina Supreme Court, “not susceptible of exact definition ” ’. Ibid. And here as there ‘ they were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection.’ Ibid.”
*649 These cases foreshadowed the complex of decisions rendered by the Supreme Court in June of this year: Bouie v. City of Columbia (378 U. S. 347); Barr v. City of Columbia (378 U. S. 146); Bell v. Maryland (378 U. S. 226); Griffin v. Maryland (378 U. S. 130); Robinson v. Florida (378 U. S. 153). In Bouie, the court, by vote of 6 to 3, set aside the 1960 South Carolina sit-in convictions of two Negro students, five Justices holding that the students had had no fair warning that the State trespass law, prohibiting entry after warning, also applied to failure to leave after request. In Barr, the court unanimously reversed for lack of evidence the conviction of five South Carolina sit-in students for breach of the peace. In Bell, the court by vote of 6 to 3, vacated the 1960 trespass convictions of 12 sit-in demonstrators at a Maryland restaurant, five Justices holding that the Maryland courts should have a chance to re-examine the convictions in light of subsequent passage of State public accommodations laws and the sixth finding their arrest and conviction unconstitutional. In Griffin the court by vote of 6 to 3, set aside the trespass convictions of five Negroes who sat in at a Maryland amusement park, five Justices resting on the fact that a county Deputy Sheriff — an agent of the State — was employed by the park to carry out its policy of discrimination. In Robinson, the court unanimously reversed the trespass convictions of 18 Florida restaurant demonstrators because State policy of segregation was embodied in a regulation requiring restaurants to have separate white and Negro washrooms.
The determined intent of the high court is unmistakably clear. Whatever the variant syntactic, juristic or philosophic patterns of these cases — and whatever the immediate context— their essential thrust — and reach — are the same; an otherwise valid State proscription is unavailing — in enforcement — when it collides with a First Amendment guarantee made obligatory on the States by the due process clause of the Fourteenth Amendment. Mr. Justice Bbeuitait, writing in Malloy v. Hogan (378 U. S. 1, 5) at the same term for the majority, summed it up: “Gitlow v. New York, 268 U. S. 652, initiated a series of decisions which today holds immune from state invasion every First Amendment protection for the cherished rights of mind and spirit — the freedoms of speech, press, religion, assembly, association, and petition for redress of grievances ”.
“ Construction of the Federal Constitution by the Supreme Court of the United States is binding on all State courts ” (People v. Muller, 286 N. Y. 281, 284). Imbued with a sense of loyalty, a State’s judiciary, to which is entrusted the high responsibility of enforcing its laws, may find it difficult to *650 assimilate this view. But, adopting Josiali Boyce’s exquisite formulation of the imperative of “ loyalty to loyalty ” it becomes its bounden duty to follow the “ supreme law of the land ” which pre-empts any other.[7]
A reading of the cases leads me to the inescapable conclusion that irrespective of any view which may be taken of errors on the trial, its procedural irregularity or the sufficiency of the evidence — and I firmly believe they invalidate the convictions — in any event, we must reverse the convictions against these defendants on constitutional grounds.
I am loath to close — lest it seem to my brethren that I have overlooked certain matters which I know they deem important. I would render it explicit that I have not ignored them. Every art in its execution requires a discriminating elimination — care must be taken to leave out nothing vital yet leave out more than is retained. The judicial discipline is an art — infinitely more than a mechanistic operation of science — which demands *651 restraint in certain areas at certain times in the context of need. The law is replete with ambivalence in the articulation of its principles — arising from a practical regard for the actions of mankind. It may not shrink, therefore, from a corresponding moderation in the application of those principles. The dichotomy of the quest and the ideal is often resolved by aspiring to approximation, not perfection — in what Paul Tillich calls “ the ambiguity of perfection ”— an adjustment to “ a world of words, and compromises, and niceties of conduct.”
In dealing with highly volatile forces “ not merely intellectual but also passionate,” the judiciary may not always find it possible to achieve a perfect solution in the interplay between dry legal considerations and dynamic social realities. It cannot always make infallibly correct judgments; it must content itself with “splendidly imperfect” ones in the anguished choice among competing goods, in the effort to potentiate and perpetuate “principles of humanity and civil liberty” (Bram v. United States, 168 U. S. 532).
For, as it has been said, there is no history without tears — and history is being written, rewritten. Nor is there any mechanical yardstick — legal or otherwise — by which fundamental social readjustments in our country can be measured — or resolved. Progress does not move along a line of linear advance but rather in some cyclical process, a distinguished American historian observes.[8]
And, lest we forget — the fortunes of civil rights for the Negro arc inextricably inter-related to the civil liberties of all Americans! In an exposition “To Be Equal”, Whitney M. Young, a foremost Negro spokesman, correctly sums it up: ‘ ‘ The negro is a barometer of whether or not the American free enterprise system really works. ’ ’ I think it was Herbert Spencer who insisted that: “we cannot be moral unless [until] all are moral, we cannot be happy unless [until] all are happy, we cannot be free unless [until] all are free ”.
The challenge is upon everybody to establish the justice of the Negro’s many grievances — it is essential to racial peace. The problem must be solved by all possible skills of citizenship *652 and government — this includes the judicial branch so far as it lies in its competence.[9]
‘ ‘ Every continent has its own great spirit of place. * * * Every people is polarized in some particular locality ”, said D. H. Lawrence. But the spirit of America transcends geography and the life of our people is polarized in ‘ ‘ the supreme law of the land.” The center of gravity of the organic functioning of our body politic resides in the Constitution — its dynamic is the imperative of equality in freedom.
In an “ optative mood ” — in Emerson’s phrase — we discern that “ at the end of the long corridor of night a crack shows beneath the door ”. Let us not close it. Let us rather open it wide. Too many have waited too long for too little! And let us not be afraid to listen to the voice of a new experience — not of a mere idea — the vibration of the stirring of the homunculus of the new epoch in our developing civilization — the reality of equality not the concept alone.[10]
It has been remarked that the basic difference between the Negro protest in our country and in Africa — is that here it is not revolutionary; in a deep sense it is conservative. The Negro is not agitating for a new social order but for his fulfilment in that which already exists — and of which he has a fundamental right to be an integral part. And the ‘[1] American Dilemma ” can be resolved only by recognizing his inalienable right “ to be equal ”.
In the continuing dialogue that goes on between the present and the past to shape the future, we must speak our part according to the light — and opportunity — given to us. Let us honor the call “ so to speak and so to do as they shall be judged by the law of liberty.”
I would reverse the convictions, remit the fines and dismiss the informations.
Hecht, J. P., concurs; Capozzoli, J., concurs in opinion; Hoestadter, J., dissents in opinion.
Judgments affirmed.

. The Sonhedrin at Usha ordained that no member could be excommunicated for his views regardless of circumstances. My revered ancestor, Rabbi, Judah Loewe (1512-1609) of Prague, who was a most passionate defender of his people and its faith in numerous dialogues declared: “ One ought not reject the words of an opponent. It is preferable to seek them out and study them. Thus shall a person arrive at the ” * * full truth ”.
In a 6,000 word dissent, Mr. Justice Story wrote in The Nereide (13 U. S. 388, 455): “I hold it an indispensable duty not to surrender my own judgment, because a great weight of opinion is against me, a weight which no one can feel more sensibly than myself.”

. Subdivision 2 proscribes acts which annoy, disturb, interfere with, obstruct or are offensive to others; subdivision 3, congregating with others on a public street and refusing to move on when ordered by the police. The term “ congregating” implies “a considerable number of persons * * * or a crowd * * • and a crowd has been defined as a throng, multiude or great number of persons” (People v. Carcel, 3 N Y 2d 327, 333).

. We must be scrupulous to permit such free expression not only to abort violence but even nonviolent resistance. Civil disobedience has a long history — going back to Ghandi, and beyond him to Tolstoy and Thoreau. The incarnation of its spirit is best expressed in the Indian word “ satyagraha ”. This connotes not a merely negative aspect, but a dynamic one. When civil disobedience, however, involves an infraction of statute not within constitutional protection (see Cantwell v. Connecticut, 310 U. S. 296), those exercising it must, in good conscience — by their own discipline — be willing to submit to the sanctions of our civil authority. But we, who are called upon to vindicate such penal sanctions, must be discreet and sure that such an infraction has in fact occurred — beyond a reasonable doubt, a norm which obtains in all criminal cases.

. “ This idea of a fair trial has been the greatest contribution made to civilization by our Anglo-American polity. Our liberties are not based on general indeterminate phrases. They are based on practical legal rules.” From an address by Professor Goodhart at the Harvard Club on June 4 under the sponsorship of American Foreign Law Association and the foreign law committee of the Association of the Bar of the City of New York.
And Brandéis wrote: “In the development of our liberty insistence upon procedural regularity has been a large factor” (Burdeau v. McDowell, 256 U. S. 465, 477). Frankfurter added: “The history of liberty has largely been the history of observance of procedural safeguards ” (McNabb v. United States, 318 U. S. 332, 347).

. Study of the report on discrimination in employment of the Senate Committee on Labor and Public Welfare (Report No. 867, 8Sth Cong., 2nd Sess., 1964) on behalf of the Association of the Bar of the City of New York led two of its committees to observe: “ The reports indicate that non-whites earn significantly less than whites of lesser training and are frequently compelled to accept unskilled or semiskilled jobs at low wages — jobs which are being wiped out at an accelerating pace by automation. They find that there has been disproportionately high unemployment levels of non-whites, who comprise 11% of the labor force but 22% of the unemployed.” (Report on Proposed Fed. Legislation Relating to Equal Employment Opportunity by The Committee on Fed. Legislation and the Comm. on Labor and Social Security Legislation, Record, Vol. 19, No. 5, pp. 231-232; see, also, Matter of Hughes [Tool Co.], N. L. R. B. decision July 2, 1964; Steele v. Louisville & Nashville R. R. Co., 323 U. S. 192; Colorado Comm. v. Continental, 372 U. S. 714.)

. The several complaints, as amended on the trial, charged that the defendant named had placed himself in a sitting position in the roadway, obstructing the free passage of vehicular traffic and had used loud and boisterous language, causing a crowd to collect; and that the complaining police officer stated in each ease that he had asked the defendant to move out of the roadway on several occasions and that the defendant had refused.
“Conviction upon a charge not made would be sheer denial of due process.” (De Jonge v. Oregon, 299 U. S. 353, 362.)

. Thus it has been clear for a long time that the freedoms of the First Amendment are obligatory upon the States by virtue of the Fourteenth Amendment. It would seem that a new era is faintly dawning. The colloquy o£ these great canons consulting together seems to be broadening' the concept of “ State action” to comprehend State ¿«action as well. That is to say, when a State fails to accord equality or due process in the exercise of the guarantees of the First Amendment by legislation or decision, the Supreme Court may act mandatorily or by inhibition to fill the void. Congress, too, can act. Thus, the Federal legislation would be dealing with State conduct which includes ¿«action. Such inaction is as much proscribed by the Fourteenth Amendment as affirmative action, if it results in a denial of equal protection of the laws. At least in part, the Civil Bights Law of 1964 is based on this premise; in any event, it can be supported on that predicate. At the National Conference of Trial Judges which met last year in conjunction with the annual meeting of the American Bar Association, Chief Judge Desmond urged abolition of Federal court power to release State prisoners by habeas corpus, at the same time urging that Congress enact precise constitutional requirements for State courts to apply. He was right; for, as he said, the present system causes “much confusion, much delay and * * * increase in the business of already overburdened courts.” That situation, however, was not the fault of the Federal judiciary alone; State courts had been adhering to the outmoded rule in People v. Defore (242 N. Y. 13) before the Supreme Court overruled Wolf v. Colorado (338 U. S. 25) and adopted Mapp v. Ohio (376 U. S. 643); there was a vacuum in procedural regularity which had to be filled by the habeas corpus expedient. This year, at the conference of Chief Justices meeting in conjunction with the American Bar Association gathering, Judge Desmond again called for an “objective, thorough, calm, scholarly, scientific” study of the allocation of judicial power (New York Times, Aug. 8 and 9, 1964). Mr. justice Brennan called on State Judges “to share fully in the job of enforcing federal constitutional rights." He suggested that if the State courts acted more vigorously to do so, friction between them and the Supreme Court would be minimized.

. In a review of “The Quest for the Dream” by John P. Eoehe, he adds: “ Our 20th century history [is] a story of ethnic wars of various kinds, wars incidental to transforming the old America into a multi-ethnic, multi-religious urban society. For all but the Negroes, the largest battles have been won, and the Negroes themselves have launched at last upon a campaign of self-assertion which cannot be forever denied. 15 * * The brutality of yesterday was not even a response to any militancy on the part of American Negroes or to any improvement in the status of the race — it was merely an ugly response to their being there at all.”

. In a recent column, Walter Lippmann says: “For an increasing number of Negroes their grievances are intolerable and will not be endured very much longer. The essential point is to prove to the large mass of peaceable Negroes that there is light at the end of the tunnel. * * * The Negro community must be enabled to believe that the public authorities are their hope and not their enemy.”

. “It is hard to listen to a new voice as it is to listen to an unknown language. * * * Out of fear. * * * The world fears a new experience * * 6 [as it] doesn’t fear a new idea. * * * It is the shifting over from the old psyche to something new, a displacement. And displacements hurt ” (Studies in Classic American literature ” — D. H. Lawrence).